UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 DEC 13  AM 10: 08

CLERK

BY _____
DEPUTY CLERK

CATHY WELCH, ADMINISTRATOR OF THE
ESTATE OF G.W., R.H., T.W., T.F.,
D.H., B.C., and A.L. by next friend Norma Labounty.

Plaintiffs,

Civil Docket No. 2:21·cv·283

v.

KENNETH SCHATZ, KAREN SHEA,
CINDY WOLCOTT, BRENDA GOOLEY,
JAY SIMONS, ARON STEWARD, MARCUS BUNNELL,
JOHN DUBUC, WILLIAM CATHCART,
BRYAN SCRUBB, KEVIN HATIN,
NICHOLAS WEINER, DAVID MARTINEZ,
CAROL RUGGLES, TIM PIETTE,
DEVIN ROCHON, AMELIA HARRIMAN,
EDWIN DALE, MELANIE D'AMICO,
ERIN LONGCHAMP, CHRISTOPHER HAMLIN,
and ANTHONY BRICE, all in their individual capacities.

Defendants.

**COMPLAINT AND JURY TRIAL DEMAND**

**INTRODUCTION**

Between 2016 and 2020, juveniles detained at the Woodside Juvenile Rehabilitation Center in Essex, Vermont and the Middlesex Adolescent Center were subjected to obscene abuse at the hands of state officials who were charged with their care and supervision. On a regular basis, vulnerable children, some of whom had been physically, mentally, and/or sexually abused by caregivers before they were taken into state custody and sent to Woodside, were physically assaulted and sometimes stripped of their clothing by Woodside staff members who demanded compliance with their orders. Many times, these same children were then confined to isolation cells in Woodside's so-called "North Unit" for days, weeks, and sometimes months at a time.

Complaints regarding this misconduct were investigated and substantiated by state investigators who, by October 2018, informed state officials that the abuse violated state regulations and had to stop. Despite these warnings, state officials in charge of Woodside disregarded the findings and continued to abuse and isolate vulnerable children through August 2019, when a federal court issued an injunction ordering a halt to such practices.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

1

Even though the court ordered a halt to the abusive tactics developed by Jay Simons for use against Woodside detainees, the abuse of children by DCF staff members then continued at a different facility in Middlesex, Vermont. An internal investigation into the assault of one of these children in April 2020 revealed that Woodside/Middlesex Adolescent Center Director Simons was actively "sabotaging" the implementation of a different crisis management system in an effort to prove that "what they were doing [before federal court intervention] was good."

This lawsuit is brought on behalf of seven young people who were abused by DCF staff members at Woodside and the Middlesex Adolescent Center. Sadly, one of these vulnerable victims, G.W., died of an accidental drug overdose in October 2021. Her claim is being pursued by her estate, which was established for the sole purpose of pursuing justice in her memory.

In addition, DCF sent two of these young people to an out-of-state facility in Tennessee called Natchez Trace Youth Academy where they suffered physical and emotional abuse by its staff members. Specific complaints about the mistreatment of one of these boys in 2017 were disregarded by DCF employees months before DCF sent the second boy to Natchez Trace where he suffered similar abuse.

## PARTIES

1. Plaintiff Cathy Welch is a resident of Corinth, Vermont and was appointed administrator of the Estate of G.W. by the Orange County Probate Court on December 5, 2021.

2. Plaintiff R.H. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

3. Plaintiff T.W. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

4. Plaintiff T.F. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

5. Plaintiff D.H. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

6. Plaintiff B.C. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

7. Plaintiff A.L. is a minor who resided in Vermont at all times relevant to this Complaint and his claims are brought on his behalf by his mother, Norma Labounty.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

8. Defendant Kenneth Schatz was the Commissioner of Vermont's Department for Children and Families (DCF) at all times relevant to this Complaint.

9. Defendant Karen Shea was a Deputy Commissioner of Vermont's Department for Children and Families at all times relevant to this Complaint.

10. Defendant Cindy Wolcott was a Deputy Commissioner of Vermont's Department for Children and Families at all times relevant to this Complaint.

11. Defendant Brenda Gooley was the Director of Policy and Operations of Vermont's Department for Children and Families at all times relevant to this Complaint.

12. Defendant Jay Simons was the Director of the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

13. Defendant Kevin Hatin was Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

14. Defendant Aron Steward was the Clinical Director at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

15. Defendant Marcus Bunnell was an Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

16. Defendant John Dubuc was an Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

17. Defendant William Cathcart was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

18. Defendant Bryan Scrubb was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

19. Defendant Nicholas Weiner was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

20. Defendant David Martinez was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

21. Defendant Carol Ruggles was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

22. Defendant Tim Piette was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

JARVIS, McARTHUR & WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

23. Defendant Devin Rochon was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

24. Defendant Amelia Harriman was employed by DCF at all times relevant to this Complaint.

25. Defendant Melanie D'Amico was employed by DCF at all times relevant to this Complaint.

26. Defendant Edwin Dale was employed by DCF at all times relevant to this Complaint.

27. Defendant Erin Longchamp was employed by DCF at all times relevant to this Complaint.

28. Defendant Christopher Hamlin was employed by DCF at all times relevant to this Complaint.

29. Defendant Anthony Brice was employed by DCF at all times relevant to this Complaint.

## JURISDICTION AND VENUE

30. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331, as it presents a federal question, and 28 U.S.C. §1343(a)(3).

31. Venue is proper pursuant to 28 U.S.C. §1391(b), as this is the judicial district in which the events related to this Complaint occurred.

## CONDITIONS AT WOODSIDE

32. DCF's Woodside Juvenile Rehabilitation Center "shall be operated by the Department for Children and Families as a residential treatment facility that provides in-patient psychiatric, mental health, and substance abuse services in a secure setting for adolescents who have been adjudicated or charged with delinquency or criminal act." 33 V.S.A. § 5801(a).

33. Juveniles detained at Woodside were informed that they would be "treated in an appropriate way" and that Woodside is "violence free – free of fighting, slapping, hitting, or physical contact in any way."

34. Juveniles detained at Woodside were further informed that they had a right to (a) a "humane and safe environment;" (b) "[f]reedom from abuse, neglect, retaliation ("pay-back"), humiliation, harassment, and exploitation," and that "Woodside

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

prohibits all cruel, severe, unusual, and unnecessary physical intervention and seclusion," and that physical restraints and seclusion would only be used as a "last resort."

35. From the outside, Woodside resembled an adult prison and had three living units. The main units, East and West, housed between 13 and 15 residents each. These units contained "dry rooms" or cells that lack plumbing. Woodside detainees assigned to the East and West Units were locked in their rooms at night and at designated times during the day. During the day, detainees in the East and West Units were allowed to congregate in large communal "day rooms" for group activities.

36. Woodside's "North Unit" contained three "wet rooms" or cells that had a sink and a toilet. The "wet rooms" eliminated the need to let a detainee held in one of these isolation cells out to use the bathroom. The North Unit also contained a padded "safe room" that was typically used for seclusion and a small windowless "day room" containing a shower and a table. Woodside staff members performed strip searches of detainees in the North Unit's "day room."

37. Woodside detainees who engaged in disruptive, aggressive, or self-harming behaviors would be confined to North Unit for days or weeks without access to education, recreation, or regular programming. Sometimes, detainees isolated in the North Unit would not be permitted to leave their cell to access the day room or shower.

38. Woodside detainees confined in the North Unit were not allowed to flush their toilets and had to ask staff to flush away their waste. Detainees would sometimes have to sit with unflushed human waste for significant periods of time.

39. Woodside detainees confined to the North Unit had an earlier bedtime than detainees held in the East or West Units and could not choose their own food. North Unit's detainees thus had to eat what staff members delivered to the isolation cells.

40. In some situations, Woodside detainees held in the North Unit were not allowed to have any possessions in their isolation cells, including a mattress, bedding, books, or paper and pencil.

41. On occasion, Woodside detainees held in the North Unit had their clothing cut off or otherwise removed and were left in isolation cells wearing nothing but their underwear or paper gowns. Sometimes children were left nude or without clothing from the waist down. For example, G.W. was held naked overnight on more than one occasion, and B.C. was naked from the waist down for two full days.

42. After he was named Woodside's director in 2011, Defendant Simons introduced a use-of-force system he called "Dangerous Behavior Control Tactics" (DBCT) that

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

had been used in adult prison facilities where he had been a use-of-force instructor for the Department of Corrections.

43. Under the direction of Defendant Simons, Woodside staff members, including Defendants Weiner, Martinez, and Rochon, would apply rotational pressure to a juvenile's joints, including wrists, shoulders, and knees, and hyperextend shoulder and rotator cuff muscle groups.

44. The use of Simons' techniques sometimes caused excruciating pain that could lead to swelling and the possibility of limited range of motion.

45. The pain compliance techniques employed at Woodside are contrary to national standards and Vermont law that prohibit the use of "pain inducement to obtain compliance" and "hyperextension of joints." VT ADC 12-3-508: 600 (648).

46. In October 2016, an attorney from the Office of the Juvenile Defender registered a complaint with Defendant Dale about the placement of Woodside detainees in isolation cells "for weeks on end – the isolation is bad for their mental health."

47. Defendant Dale forwarded the Juvenile Defender's complaint to Defendants Simons and Steward.

48. When the Office of the Juvenile Defender registered complaints about the conditions of confinement at Woodside, Woodside officials retaliated against the juveniles on whose behalf the complaints had been made, interfered with their right to counsel, and pressured at least one of them to sign notes to his attorneys indicating that they should withdraw a motion for a protective order filed in the Vermont Superior Court, Family Division.

49. No later than July 2018, DCF management officials, including Defendants Schatz, Shea, and Gooley, were aware of the conditions of confinement in Woodside's North Unit and the physical abuse of Woodside residents for a number of reasons.

50. Between May 2018 and July 2019, the Defender General's Office of the Juvenile Defender filed a series of motions in Vermont's family courts requesting orders prohibiting Woodside staff from using excessive restraints and pain compliance techniques against Woodside detainees and housing detainees in the North Unit's isolation cells.

51. In May 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order in the Vermont Superior Court, Rutland Family Division, on behalf of T.W.

52. The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents to stop restraining [T.W.] unnecessarily and in violation of state regulations, stop using dangerous restraint techniques designed to induce pain …"

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

53. In July 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order in the Vermont Superior Court, Franklin Family Division, on behalf of R.H., who was a Woodside detainee.

54. The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents to stop subjecting [R.H. to] unnecessary physical restraint, stop using dangerous restraint techniques designed to induce pain, stop subjecting him to seclusion and solitary confinement in violation of applicable state regulations…"

55. In June 2019, the Defender General's Office of the Juvenile Defender filed a Verified Motion for a Protective Order in the Vermont Superior Court, Chittenden Family Division, on behalf of G.W.

56. The Juvenile Defender's verified motion indicated that her client, who was a Woodside detainee, was subjected to excessive restraint and seclusion and the forcible removal of her clothing and was forced to remain naked in the presence of a male staff member.

57. The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents from confining [G.W.] in Woodside's segregation unit, subjecting her to excessive restraint and seclusion, subjecting her to forcible removal of her clothing, forcing her to remain naked in the presence of male staff…"

58. The Juvenile Defender's verified motion included an affidavit executed by Paul Capcara, R.N., that reviewed Woodside's conditions of confinement, describing in detail the use of pain compliance techniques and the excessive and inappropriate use of solitary confinement, to the detriment of Woodside detainees who were subject to these conditions of confinement.

59. Capcara's affidavit ended with this statement: "I have repeatedly testified about my concerns regarding the unusual and harmful practices at Woodside for over a year. DCF's leadership has known about these dangerous conditions as the result of my testimony and that of other expert witnesses, as well as their own internal investigations. Despite this knowledge, the dangerous and harmful practices persist."

60. DCF's Residential Licensing & Special Investigations Unit (RLSIU) was responsible for conducting investigations into complaints related to the conditions of confinement at Woodside.

61. On October 23, 2018, DCF held a Woodside Stakeholder Meeting. Defendant Schatz attended the meeting. The following day, the Juvenile Defender sent Defendant Schatz a follow-up email detailing the deplorable conditions of confinement.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

62. In that email, the Juvenile Defender explained to Defendant Schatz that "I have seen things at [Woodside] that if perpetrated by a parent, would have likely resulted in substantiation, removal [of the child from the home], and criminal prosecution. As a former DCF investigator, it takes a lot to shock and dismay me. I am shocked and dismayed at Woodside on a regular basis. Moreover, the lack of accountability for staff who hurt residents and perpetrate a culture of silence in the face of resident mistreatment is deeply troubling."

63. In October 2018, after RLSIU investigated complaints related to the treatment of R.H., T.W., T.F., and B.C. at Woodside, RLSIU investigators filed reports concluding that Woodside staff members violated Vermont law.

64. In particular, RLSIU concluded that Woodside's attempt to silence R.H. violated Regulation 201; the use of Defendant Simons' pain compliance techniques violated Regulation 648; depriving detainees meals, water, rest, or opportunity for toileting violated Rule 648; the repeated use of physical restraints without due cause violated Rule 651; the failure to constantly monitor detainees in solitary confinement violated Rule 660; the failure to regularly flush the toilets in North Unit's isolation cells violated Regulation 718; and the use of North Unit's isolation rooms to seclude Woodside's detainees violated Regulation 718.

65. The RLSIU investigators informed the "Governing Authority", i.e., DCF, that it had to "provide RLSIU a plan to address the identified areas of Non-Compliance and areas of Compliance, but with Reservations, with the intent to come into full compliance [with Vermont's Residential Treatment Program Regulations] by November 16, 2018."

66. In November 2018, after RLSIU investigated a different complaint filed by the Juvenile Defender on behalf of T.W., the investigators concluded that Woodside staff members violated Vermont law.

67. In particular, based on this investigation, RLSIU concluded that Woodside's use of Defendant Simons' pain compliance techniques violated Regulation 648 and 650; Woodside's inappropriate use of restraints violated Regulation 651; and Woodside's failure to monitor T.W. when she was placed in a North Unit seclusion cell violated Regulation 660.

68. Based on this investigation, RLSIU investigators informed the "Governing Authority," i.e., DCF, that it had "to provide RLSIU a plan to address the identified areas of Non-Compliance and areas of Compliance, but with Reservations, with the intent to come into full compliance [with Vermont's Residential Treatment Program Regulations] by November 16, 2018."

69. On August 31, 2018, Paul Capcara filed a complaint with RLSIU indicating that he had reviewed a video recording of staff members as they physically restrained a detainee while placing her in the North Unit.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

70. According to the complaint, the video showed the male staff members who restrained the young woman, leaving her naked from the waist down in her isolation cell.

71. A psychologist further reported that the detainee was not provided with bedding or adequate clothing or coverage for her lower body for 48 hours.

72. RLSIU investigators reported that they had reviewed three videos of the incident. The investigators provided the following description of the third video:

> "[Defendant] Hatin debriefs with the camera and says 'Ok, per [Defendant] Steward and [Defendant] Simons, any loose clothing that has been ripped, based on [the detainee's] history we were directed to remove it from her room...' He talks to [the detainee] through the door and asks 'Are you going to hand it to me or not?' [Defendant] Hatin waits 5 seconds (as counted on the video) and responds, 'Well we'll take that as a "no".' Then [Defendant] Hatin and two other male staff members enter the room and begin struggling to restrain [the detainee] as she is screaming 'Don't touch me.' One male staff member is at a tug of war with [the detainee] for the ripped sweatpants. During this time, [the detainee] is being moved around on the floor with her buttocks and vulva exposed. [A youth counselor] removes partial elastic from [the detainee's] upper torso with a cutting tool. As the restraint is ending, [the detainee] is silent in the fetal position."

73. After completing the investigation into Capcara's complaint, RLSIU investigators concluded that Woodside violated Regulation 201 when B.C. "was left with the lower half of her body uncovered for two days. [B.C.] was not provided a mattress, blanket or safety smock. [B.C.] was restrained and secluded without appropriate therapeutic supports." Furthermore, there was "no justification for the removal of [B.C.'s] bedding and food. [B.C.] was left without clothing for the lower half of her body for two days," in violation of Regulation 648.

74. The RLSIU investigators also concluded that Woodside was in violation of Regulation 650 when staff members inappropriately restrained the female detainee.

75. Based on this investigation, RLSIU investigators informed the "Governing Authority," i.e., DCF, that DCF had to "provide RLSI a plan to address the identified areas of Non-Compliance and Compliance, but with Reservations, with the intent to come into full compliance [with Vermont's Residential Treatment Program Regulations] by November 16, 2018."

76. Despite these orders, DCF took no concrete steps to require Woodside "to come into full compliance [with Vermont's Residential Treatment Program Regulations]" and end the inappropriate use of physical restraints, the use of Defendant Simons' pain compliance techniques, or the inappropriate use of solitary confinement.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

9

77. In fact, in response to RLSIU's detailed investigative reports, Defendants Schatz and Shea refused to acknowledge that physical or emotional abuse of Woodside detainees was an on-going problem at that facility.

78. In a letter dated November 16, 2018, Defendants Schatz and Shea made the following commitments:

- "Retaliation is not acceptable and we do not believe that it is a pervasive issue at Woodside."
- "Trauma informed de-escalation strategies are an important component to the program that hopefully will result in very few to zero incidents of restraint and seclusion. Woodside is examining and re-evaluating its current de-escalation strategies as part of the review of restraint modality at Woodside."
- "The use of emergency safety interventions is an area that Woodside is committed to continuously improve."
- "With respect to concerns regarding Woodside's use of the North Unit, we do not have any specific corrective actions with respect to these observations until we decide the future of Woodside and its role in the system of care."

79. Defendants Schatz and Shea then described why they disagreed with "a number of individual findings and conclusions drawn from [RLSIU's detailed] reports."

80. Defendants Schatz and Shea did not specifically identify what findings they disagreed with but instead claimed that the unspecified findings resulted from a number of factors, including "[i]nappropriate acceptance of allegations," "lack of details and input from all individuals involved," and "lack of understanding or analysis related to the traumatic impact *staff* experience from these situations." (Emphasis added).

81. As a result of Defendants Schatz's and Shea's failure to fulfill their statutory and constitutional obligations to protect the safety and welfare of Woodside detainees seriously, the abuse of those children continued unabated.

82. Nothing demonstrates Defendants Schatz's, Shea's, Gooley's, and Simons' deliberate indifference for the constitutional rights of juveniles detained at Woodside more than a video recording of the shocking and inhumane treatment of G.W. in July 2019.

83. "This video was shot from the corridor outside a cell. It shows a horrific incident involving a teenage girl about 16 years old. The girl is completely naked. The girl is streaked with excrement. She is agitated and has moments of angry accusation followed by wild laughter. She is obviously in the middle of an acute mental crisis. In the course of the video, she is moved a few feet from a cell or anteroom into a white tiled space. The staff who moved her are dressed in "haz-mat" suits and hoods. They are all men except for a woman who can be heard in the background. They push a concave plastic shield against the girl's body and push

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

her from the anteroom into the tile space where the door is locked. A female staff member can then be heard talking to the girl, who is occupied in pushing a wire into her right forearm. The girl is asked why she is doing that. No one interrupts this action on the video. The treatment of this girl is entirely inappropriate and demonstrates within a few minutes Woodside's limited ability to care for a child who is experiencing symptoms of mental illness." *Disability Rights v. State of Vermont*, 19-cv-106, Doc. 34, p. 11.

84. An EMT who responded to a call from Woodside to check G.W. for a possible concussion called DCF's child abuse hotline and reported that G.W. was naked, covered in feces, urine, and menstrual blood, and was nearing hypothermia.

## CONDITIONS OF CONFINEMENT
## NATCHEZ TRACE JUVENILE ACADEMY

85. In a letter dated May 21, 2015, the West Virginia Department of Health and Human Resources notified Tom Hennessey, CEO of Natchez Trace Youth Academy, that the state had decided to suspend placement of West Virginia children at that facility.

86. An investigation undertaken by the West Virginia Department of Education indicated that the facility was loud and chaotic; the facility's direct care staff was unprofessional; teachers were unprepared during instruction; West Virginia's students did not feel safe at the facility; staff would take students away from the view of cameras and beat them up; and cottages where students lived were dirty and in poor condition.

87. Vermont children placed by DCF at Natchez Trace reported similar problems at that facility.

88. In July 2017, the Office of the Juvenile Defender informed Defendant Erin Longchamp that D.H. was subjected to an off-camera restraint during which a staff member kicked him in the testicles, and D.H. was repeatedly threatened with physical harm.

89. In one instance, a staff member warned D.H that "if you move, I'll break your neck."

90. D.H. reported that the place was filthy and was only cleaned up when DCF staffers made scheduled visits to the facility.

91. In September 2017, the Office of the Juvenile Defender contacted Defendant Melanie D'Amico, DCF's Residential Services Manager, and explained in detail the conditions at Natchez Trace and the abuse of D.H. at that facility.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

92. Defendant D'Amico responded by telling the Office of the Juvenile Defender that she was "worried that these overgeneralization (sic) you are making are not helpful and undermine the good work the Natchez Trace program is and has done. Only positive experiences have been reported to me."

93. In or about 2017, the mother of a child placed at Natchez Trace by DCF reported the abuse of her child at that facility to Defendants Schatz, Wolcott, and D'Amico.

94. The mother apparently reported that a staff member at that facility was "choking kids out" and that her child had been subjected to physical abuse and suffered injuries at the hands of staff members.

95. The mother reported this abuse to DCF, but DCF staff members did not believe the complaints.

96. DCF officials, including Defendants Schatz, Wolcott, and D'Amico, apparently did not take these complaints seriously and instead continued to place children in its custody, including R.H., at Natchez Trace Juvenile Academy.

## THE EFFECTS OF SOLITARY CONFINEMENT ON JUVENILES

97. Stuart Grassian, M.D., is a board-certified psychiatrist who has studied the effects of solitary confinement on juveniles. Dr. Grassian's observations and conclusions generally regarding this population and the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, including *Davenport v. DeRobertis,* 844 F.2d 1310 (7th Cir. 1988), *Coleman v. Wilson, 912* F.Supp. 1282 (E.D. Cal., 1995), affirmed sub. nom. *Brown v. Plata,* 131 S. Ct. 1910 (2011), *Madrid v. Gomez,* 889 F. Supp. 1146 (N.D. Cal. 1995), and in opinions by Justices Kennedy, Sotomayor, and Brennan in the United States Supreme Court.

98. In a report prepared for Plaintiffs' counsel in this case, Dr. Grassian made the following observations:

99. Solitary confinement of juveniles causes far greater harm in juveniles than in adults, and the risks of solitary confinement to juveniles are alarming. Research on adolescent development makes clear why juvenile solitary confinement is uniquely harmful.

100. New technologies in brain research have allowed us to recognize and observe brain plasticity, that brain function and neural connectedness are still evolving and developing during adolescence, especially so in regard to the functioning of the prefrontal cortex – that part of the brain most centrally involved in inhibiting emotional reactivity, allowing mastery over the emotional reactivity of the subcortical amygdala and nucleus accumbens - the brain's more primitive emotional centers.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

101. Brain research, both human and animal studies, has amassed a clear picture of this process[1] and there is clear evidence that this process of brain development can be derailed by stress.

102. The effects of stress on adolescent brain development has been described in detail,[2] and there is by now a substantial body of research describing the severe lasting effects of stress on the human brain, and the particular vulnerability of juveniles to such effects.[3]

103. There has also been a large body of research using animal models,[4] demonstrating long-term consequences of chronic unpredictable stress.

104. The research has demonstrated that the brain's reaction to stress, the surge of cortisol (the stress hormone) modulated through the brain's hypothalamic-pituitary-axis, is massively affected in adolescents who have experienced chronic stress.

105. Research further demonstrates that acute stress impairs the juvenile's ability to maintain goal-directed, as opposed to emotion-driven, behavior.[5] Functional brain studies have provided evidence that while adults are able to engage prefrontal cortical mechanisms to inhibit behavior that is likely to have adverse consequences, adolescents are unable to do so.[6] These consequences – including actual morphological changes in brain structure – have been demonstrated to persist into adulthood.[7]

---

[1] *See, e.g.:* Casey, B.J., Jones, R.M., and Hare, T.A., (2008) *The Adolescent Brain,* Ann. N.Y. Acad. Sci. 1124: 111-126; Ernst, M., Mueller, S.C. (2008) *The adolescent brain: Insight from functional neuroimaging research.* Dev. Neurobiol 68(6) 729-743.

[2] *See, e.g.:* Tottenham, N., Galvan, A. (2016) *Stress and the adolescent brain. Amygdala-prefrontal cortex circuitry and ventral striatum as developmental targets.* Neuroscience and Biobehavioral Reviews 70:217-227.

[3] For a detailed discussion and bibliography, see, e.g. Bremner,J. (2006) *Traumatic Stress: effects on the brain.* Dialogues in Clinical Neuroscience; Vol. 8, No. 4, 445-461

[4] The harm caused animals by experimentation involving social isolation has in fact led to restrictions of such experimentation by academic review boards. For example, Columbia University has passed rules severely restricting the housing of experimental animals alone in cages.

[5] *See, e.g.:* Plessow, F. et.al. (2012) *The stressed prefrontal cortex and goal-directed behaviour; acute psychosocial stress impairs the flexible implementation of task goals.* Exp Brain Res 216:397-408.

[6] Uy, J., Galvan, A. (2016) *Acute stress increases risky behavior and dampens prefrontal activation among adolescent boys.* J. Neuroimage, http??dx.doi.org/10.1016/j.neuroimge.2016.08.067

[7] *See, e.g.* Hollis, F. et.al. (2012) *The Consequences of adolescent chronic exposure to unpredictable stress exposure on brain and behavior.* Jl. of Neuroscience, http://dx.doi.org/10.1016/j.neuroscience.2012.09.018; Tottenham, N, Galvan, A. (2016).

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P.O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

106. The very act of placing a juvenile in isolation – the utter helplessness of it – is enormously stressful. This surge of cortisol – of fear, anxiety, and agitation – will be especially severe in juveniles.

107. The brain research has yielded very clear and consistent results: As noted in an amicus brief to the United States Supreme Court: "each key characteristic of solitary confinement – lack of physical activity, meaningful interaction with other people and the natural world, visual stimulation and touch – is by itself sufficient to change the brain and to change it dramatically."[8] As brain researchers have noted, especially in juveniles, factors like stress and depression can literally shrivel areas of the brain, including the hippocampus, the region of the brain involved in memory, spatial orientation, and the control of emotions - a burden that may well become permanent.

## SOLITARY CONFINEMENT IN THE NORTH UNIT

108. Based on his review of the documents provided to him by Plaintiffs' counsel, Dr. Grassian offered the following observations that the solitary confinement experienced by juveniles at Woodside, and in particular the conditions experienced by G.W., was in no way less harsh than the solitary confinement of adults:

### Physical Setting

109. Cell - Solitary confinement cells in adult prisons are small, generally about 90-100 square feet in size. The North Unit cells at Woodside are approximately the same. In adult prisons, solitary confinement cells typically contain either a metal bed fixed to the floor or a concrete slab on which a mattress is placed and a stainless-steel sink and toilet combination. This is the case in three of the four North Unit cells at Woodside; the fourth is a "dry cell" lacking a toilet, sink, or any source of fresh water. Sometimes in adult solitary cells there is also a concrete or hard plastic stool and a small steel shelf or table fixed to the wall. This is apparently lacking in the North Unit cells.

110. Adult prison cells have various types of locking doors, and they also sometimes vary in the amount of visual stimulation allowed. These include barred doors, barred doors with a plexiglass wall bolted onto it, sliding steel or hinged steel doors. Hinged steel doors tend to be the harshest, allowing very little ventilation and making conversation through the door very difficult. The videos I was shown in this case indicate that the North Unit doors were hinged doors.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

*Stress and the adolescent brain; Amygdala-prefrontal cortex circuitry and ventral striatum as developmental targets.* Neuroscience and Behavioral Reviews, 70, 217-227.
[8] Amicus Brief to U.S. Supreme Court of Medical and Other Scientific and Health-Related Professionals filed 12/23/16 in *Ziglar v. Abbassi et.al.* and companion cases.

14

111. In the adult prison setting, there is usually a window facing the outside world, allowing some amount of visual stimulation. Harsher settings either have no window to the outside or the window is glazed or painted over in such a way as to not allow the occupant to see through the window. The videos I was provided seem to indicate that the North Unit cells have windows that are glazed in such a fashion as to render them translucent but not transparent.

112. In the adult solitary confinement setting, food is generally delivered through a cuff port, and the occupant eats alone, either sitting on his bed or, if available, on a stool with a little table affixed to the wall. The cells in the North Unit appear to lack such a stool and table for eating.

113. In adult solitary, "recreation" or "exercise" is generally an hour a day, several days a week (most typically, Monday-Friday) in either another cell or outdoors in either a concrete enclosure or in a long narrow chain link "dog run." In the latter circumstance, sometimes other inmates will be out in adjacent dog runs. The North Unit provides no outside recreation at all, only access to a relatively small, fairly barren "day room." And the documents provided indicate that in many cases, including G.W.'s, access to the day room is only sporadic; sometimes over a week can go by with the juvenile having no opportunity at all to leave her cell.

114. In isolated confinement, there is generally very limited opportunity for any form of normal social interaction. Inmates sometimes invent or discover some limited way of communicating with other inmates on their tier – e.g., shouting, using the vent system as a kind of intercom system, etc. Telephone contact is quite limited. Social and family visits are limited and are almost always non-contact, often with a plexiglass window allowing visual contact and telephones required to speak with the visitor. Inmates often spend days, weeks, or even months with no social interaction other than curt interactions with correctional staff. It is my understanding that at the North Unit, children have no interaction with anyone at all from 8 p.m. until 9 a.m. the next morning, and that children could go days, weeks, or even months without contact with other children.

115. An adult in solitary confinement will typically be allowed to have a limited amount of reading material in her cell, including books shipped directly from the publisher. The inmate may also have some other means of distracting herself – a radio, a small tv, or an mp-3 player, etc. It is my understanding that in the North Unit no such amenities are permitted, not even books, and furthermore there was no access to TV or radio.

116. This lack of reading materials is part of an especial concern for juveniles in a detention facility. The responsibility of a juvenile detention facility is not only to provide custody and security, its mission is also centrally one of providing service to help the juvenile mature into a responsible and productive adult. Educational services are an essential part of that responsibility, and apparently

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

there are virtually no educational services provided to juveniles confined in the North Unit – just papers passed under the cell door. No teacher meets with the student.

117. There are other features of confinement at the North Unit that are almost unprecedented. Many commentators have described the excessive use of force widely used at the North Unit. I certainly am not naïve enough to think that Corrections Officers in adult prisons never intentionally cause inmates pain, but such abuse is limited by the fact that it is officially prohibited. On the other hand, at Woodside "pain compliance" techniques are in fact taught and authorized. There are videos showing G.W. screaming as her arms are being hyperextended over her head. Several observers have commented that Woodside staff lack mental health training and, instead of finding ways to deescalate the situation with an emotionally troubled juvenile, they resort to force and intimidation.

118. In addition, at times G.W. was left naked for long periods of time in her cell in the North Unit, her clothes having been pulled off her by several male staff converging on her and holding her down. This is especially concerning as G.W. is reported to have been raped some months before she was forcibly stripped by several male staff and then left naked in her cell.

## FACTUAL BACKGROUND
## D.H.

119. After Plaintiff D.H. was placed into the custody of DCF, D.H. was detained at Woodside, was subjected to solitary confinement in the North Unit, and was sent out-of-state to Natchez Trace Youth Academy where he was physically abused on a regular basis.

120. For example, one Natchez Trace staff member threatened that he would "snap [D.H.'s] neck." Another staff member tackled him, while another kicked him "in [his] balls."

121. While detained at Natchez Trace Youth Academy, D.H. brought the inhumane conditions at that facility to the attention of Defendant Dale.

122. D.H. told Defendant Dale that Natchez Trace "was a bad place, staff hit a kid's face off the wall and his nose started to bleed."

123. D.H.'s reports of the inhumane conditions at the Natchez Trace facility were ignored by Defendant Dale.

124. In July 2017, the Office of the Juvenile Defender reported the abuse of D.H. at Natchez Trace to Defendant Longchamp.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

125. DCF did not respond to the Juvenile Defender's report of the inhumane conditions at the Natchez Trace facility and the abuse of D.H.

126. In September 2017, the Office of the Juvenile Defender reported the abuse of D.H. at Natchez Trace to Defendant D'Amico.

127. The Juvenile Defender's email reporting this abuse to Defendant D'Amico included a link to the letter sent to the CEO of Natchez Trace by the West Virginia Department of Health and Human Resources in May 2015.

128. The Juvenile Defender's report of the inhumane conditions at the Natchez Trace facility and the abuse of D.H. was ignored apparently by Defendant D'Amico.

129. In December 2017, while engaging in disruptive and annoying behavior at Woodside, Defendant Dubuc sent an email notifying staff that "after discussion at the Clinical Team it was decided that DH would benefit from increased support and lower stimulation" in one of the North Unit's isolation cells.

130. The decision to commit D.H. to solitary confinement in one of Woodside's isolation cells violated North Unit's procedure requiring Woodside detainees to demonstrate actual harm or imminent risk of harm to self or others before they could be isolated in the North Unit.

131. When asked about the decision to send D.H. into solitary confinement, Defendants Simons and Steward gave contradictory explanations, neither of which were based on North Unit's policy that only those who demonstrated actual harm or imminent risk of harm to self or others could be placed in a North Unit isolation cell.

## FACTUAL BACKGROUND
## R.H.

132. Between April 2010 and December 2018, the Vermont Department for Families and Children (DCF) had custody of R.H. While he was in the custody of DCF, R.H. experienced at least forty different placement transitions, ending with his detention at DCF's Woodside Juvenile Detention Center.

133. Numerous evaluations confirm that R.H. had suffered from repeated physical, mental, and sexual abuse as a child and, as a result of his history of trauma and abuse, he suffered from a number of psychiatric conditions, including post-traumatic stress syndrome, that contributed to his challenging behaviors and internal emotional distress.

134. Between March 2018 and December 2018, R.H. was detained at DCF's Woodside Juvenile Detention Center.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

135. Between March 2018 and December 2018, R.H. spent at least 67 days in solitary confinement in Woodside's North Unit.

136. While R.H. was being held in solitary confinement in Woodside's North Unit, Woodside staff turned off the water to R.H.'s locked cell, and he was unable to flush his toilet or get a drink of water.

137. At times, R.H. was not provided with a mattress or books to read.

138. In April 2018, Defendant Simons and Defendant Steward decided to take everything out of R.H.'s isolation cell, including his mattress, blanket, and reading material, and told R.H. he could "earn it back."

139. On April 17, 2018, Woodside staff restrained R.H. in an effort to effectuate the plan. When R.H. resisted, Woodside staff, led by Defendant Dubuc, entered R.H.'s isolation cell equipped with a riot shield, restrained him face down on his bed, and cut off R.H.'s clothing. R.H. spent the remainder of the night dressed only in his shorts.

140. Following the incident, R.H. reported that he experienced the forcible removal of his clothing as "like a sexual assault," something that he had, in fact, experienced as a child.

141. While held in solitary confinement in his North Unit seclusion cell, R.H. was deprived of educational services required by his Individualized Education Plan.

142. Defendant Steward approved the orders sending R.H. into solitary confinement.

143. Between March 2018 and December 2018, R.H. was physically restrained about ten times during which Woodside staff, including Defendants Hatin, Weiner, Martinez, and Rochon, employed the pain compliance techniques developed by Defendant Simons.

144. Defendant Steward signed the orders authorizing the physical restraint of R.H.

145. Several weeks later, Defendant Steward watched Woodside staff members hurting R.H. and did not intervene or take other steps to protect R.H.

146. Instead, Defendant Steward threatened R.H., telling him that Woodside staff would take away his clothes again if he did not comply with her plan.

147. In addition to being abused at Woodside, R.H. was placed at several out-of-state juvenile detention centers, including Natchez Trace Youth Academy in Tennessee.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

148. While detained at Natchez Trace Youth Academy, R.H. was physically abused by staff members employed by that facility on a regular basis.

149. R.H.'s complaints to Defendant Amelia Harriman regarding this abuse were ignored and never seriously investigated.

## FACTUAL BACKGROUND
## T.W.

150. In 2018, Plaintiff T.W. was detained at the Woodside Juvenile Rehabilitation Center ("Woodside") in Essex, Vermont.

151. While T.W. was being detained at Woodside, Plaintiff was repeatedly and unlawfully placed in a seclusion cell in the so-called "North Unit" and repeatedly and unlawfully subjected to painful physical restraints.

152. The unlawful isolation of T.W. in the North Unit seclusion cell and painful physical restraints is detailed in Woodside Orders for Restraint/Seclusion dated February 11, 2018; February 13, 2018; February 27, 2018; March 5, 2018; March 7, 2018; April 8, 2018; May 4, 2018; May 6, 2018; May 24, 2018; and May 25, 2018.

153. According to these incident reports, Defendants Simons and Steward issued these unlawful orders.

154. According to these incident reports, Defendants Bunnell, Cathcart, and Dubuc requested and/or received and carried out the orders to unlawfully place T.W. in a North Unit isolation cell or physically restrain her.

155. On May 29, 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order requesting a court order requiring Defendant Schatz and his agents working at Woodside to stop using dangerous restraint techniques designed to induce pain.

156. RSLIU conducted an investigation into the use of the dangerous restraint techniques used on T.W. and her placement in the North Unit's isolation cells alleged in the Motion for a Protective Order.

157. RSLIU's investigative report concluded that Woodside's (a) use of a restraint modality that uses pain compliance that can result in hyperextended joints on Plaintiff; and (b) use of the North Unit's isolation cells to seclude Plaintiff both violated Regulations 201 (right to humane treatment and right to be free from excessive use of restraint and isolation); 648 (prohibition of pain inducement techniques and hyperextension of joints); 650 (prohibition of restraint modality that is not approved by licensing agency); 651 (restraint shall only be used as last

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P.O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

resort); and 660 (children in seclusion must be provided with uninterrupted supervision by qualified staff).

158. RSLIU's report concluded that the "Governing Authority must provide RSLI a plan to address the identified areas of Non-Compliance and areas of Compliance, but with Reservations, with the intent to come into full compliance by November 16, 2018."

## FACTUAL BACKGROUND
## G.W.

159. G.W. was detained at Woodside and subjected to painful physical restraints and solitary confinement in 2016 and 2019.

160. In 2016, G.W. was detained at Woodside for about five weeks in May and June and for about three months between September and December.

161. Between September and December 2016, G.W. was detained in a North Unit isolation cell where she was physically restrained at least 31 times.

162. On occasion, G.W. had no clothes and was only provided with a blanket. At times, she was left naked in her isolation cell without clothes or a blanket.

163. In October 2016, the Office of the Juvenile Defender sent Defendant Dale an email complaining about the treatment of G.W. at Woodside, explaining that G.W. "seems to be getting worse at Woodside and on ISU, not better. [G.W.] appears to be more depressed every time I see her, and she has no hope that things will improve. Without hope, what incentive to (sic) [G.W.] have to do anything? Furthermore, there seem (sic) to be some significant mental health needs that remain unmet."

164. Defendant Dale forwarded the Juvenile Defender's email to Defendants Simons and Steward.

165. In May 2019, after stealing a car and crashing it during a police chase, G.W. was again detained at Woodside.

166. Before her release in July 2019, G.W. was subjected to solitary confinement in a North Unit isolation cell.

167. A series of videos depict the conditions of her nightmarish confinement in the North Unit.

168. One video captures Woodside staff rushing into her cell and pushing her against the wall with a large riot shield.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

20

169. Another shows her naked and screaming as Woodside staff members drag her across the floor.

170. A federal court described what it saw on a third video as a "horrific incident" involving Woodside staff members doing nothing as G.W. sits in her isolation cell, naked and covered in feces, as she inserts a wire into her arm.

## FACTUAL BACKGROUND
## T.F.

171. Plaintiff T.F. entered DCF custody when she was eight years old; by 2017, she had endured thirty-seven placement transitions.

172. Between the ages of three and seven, T.F. had been sexually abused by her father, had been subjected to physical abuse, and had witnessed physical abuse of other family members.

173. Between 2015 and 2018, T.F. was detained at Woodside on a number of separate occasions during which she was subjected to unnecessary and painful physical restraints and solitary confinement in one of the North Unit's isolation cells.

174. During one of her stays at Woodside, T.F. was apparently held in solitary confinement in a North Unit isolation cell for three to four months.

175. On June 27, 2018, T.F. was physically restrained by Defendants Bunnell and Piette, and dragged across the floor by her feet to her cell with Bunnell still on top of her.

176. As a result of this assault, T.F. suffered friction burns on her body.

177. A video recording of this incident indicates that Defendant Bunnell appeared angry, agitated, and aggressive.

178. On July 5, 2018, T.F.'s attorney from the Office of the Juvenile Defender filed a Motion for an Emergency Protective Order.

179. Subsequently, DCF's RLSIU investigated the allegations set forth in the Motion for an Emergency Protective Order.

180. Following the investigation, RLSIU concluded that the conduct of Woodside staff on June 27, 2018 toward T.F. was in violation of Regulation 201 (children in a residential treatment program have a right to "be free from harm by caregivers or others, and from unnecessary or excessive use of restraint and seclusion/isolation); Regulation 648 (Residential Treatment Programs are prohibited from employing "[r]estraints that impede a child/youth's ability to breathe or communicate," or using "[p]ain inducement to obtain compliance,"

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

and "[h]yperextension of joints;" and Regulation 651 ("Restraint shall be used only to ensure immediate safety of the child/youth or others when no less restrictive intervention has been, or is likely to be, effective in averting danger. Restraint shall only be used as a last resort").

## FACTUAL BACKGROUND
### B.C.

181. Plaintiff B.C. has an extensive history of trauma and neglect. B.C.'s mother abandoned her as a toddler, and she was raised by one of her father's relatives and his wife.

182. As a child, B.C. was sexually abused.

183. B.C. entered DCF custody as an unmanageable youth after she tried to run away while she was being transported to an alternative school in Bennington, Vermont.

184. After a court adjudicated her guilt in two minor delinquent offenses (disorderly conduct and retail theft), B.C. was sent to Woodside.

185. While detained at Woodside, B.C. was repeatedly subjected to improper physical restraints and solitary confinement.

186. For example, on August 25, 2018, Defendant Hatin and two other male Woodside staff members entered B.C.'s North Unit isolation cell and, with the assistance of Defendant Ruggles, pinned her to the floor and forcibly removed her clothing, leaving her buttocks and vulva exposed.

187. Before cutting her clothes off, Defendant Ruggles told B.C. that if she surrendered her clothes, she would be provided a safety smock.

188. Throughout the incident, B.C. cried out "Don't touch me."

189. As the restraint ended, B.C. was silent in the fetal position.

190. Afterwards, B.C. was not provided with bedding or adequate clothing for her lower body for 48 hours.

191. After reviewing a video of the incident, Paul Capcara, R.N., reported the abuse of B.C. with DCF's RLSIU.

192. Mr. Capcara was particularly "concerned that [B.C.] was left naked from the waist down as a result of the restraint. There were further concerns that given the youth's sexual abuse history, the restraint was authorized to be done by a group of male staff members."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

22

193. After completing their investigation, RLSIU investigators criticized Defendant Ruggles attempt to use the provision of a safety smock as a bargaining chip: "The language [recorded on the video] describes a power struggle between [B.C.] and the staff members at Woodside, which is advised against in her safety plan and not aligned with DBT practice. The safety smock should be seen as a basic need for [B.C.'s] safety and privacy, not a bargaining chip for compliance."

194. RLSIU investigators then concluded that Woodside was found in violation of Regulation 201 (a resident has the right to be free from excessive use of restraint and seclusion); Regulation 601 (a residential treatment program shall provide adequate supervision to the treatment and developmental needs of children/youth); Regulation 648 (a residential treatment facility shall prohibit all cruel, severe, unusual or unnecessary practices); Regulation 650 (restraints may not be employed without prior approval of the Licensing Authority); Regulation 651 (limitations on the use of restraints); Regulation 660 (residents in seclusion cells shall be subject to uninterrupted monitoring); and Regulation 718 ("No child/youth's room shall be stripped of its contents and used for seclusion").

## FACTUAL BACKGROUND
## A.L.

195. In 2018, A.L. was in DCF custody and detained at Woodside.

196. A.L., who turned 13 on November 23, 2017, was the youngest Woodside detainee.

197. In 2018, A.L was repeatedly subjected to painful restraints by Woodside staff members.

198. On August 13, 2018, for example, A.L. suffered rug burns from being dragged on the floor during one of these restraints.

199. In addition, A.L. spent extended periods of time in solitary confinement, locked away in one of the North Unit seclusion cells.

200. Defendant Steward approved staff requests to send A.L. into solitary confinement in Woodside's North Unit.

201. In April 2018, Defendant Dubuc ordered A.L. into the North Unit, later claiming that A.L. "voluntarily" agreed to Dubuc's unilateral decision to place A.L. into solitary confinement.

202. In response to grievances filed on behalf of A.L., Defendant Simons justified Woodside's use of physical restraints and solitary confinement as a legitimate method to control A.L. behavior.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P.O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

23

203. The physical abuse of A.L. continued after DCF sent its detainees to the Middlesex Adolescent Program (MAP) in 2020.

204. On April 15, 2020, a video recording captured Defendant Brice shoving A.L. "with significant force using two hands on [A.L.'s] neck. [A.L.] appears to be pushed into the wall from the force of the shove to the neck."

205. The previous day, Brice notified Defendant Simons that he "was feeling anxiety and having difficulty sleeping because of the working conditions at MAP."

206. Simons denied Brice's request to be relieved of duty and was required to complete his shift.

207. The incident was subsequently investigated by DCF's Residential Treatment Program Regulatory Intervention Unit (RTPRI) whose investigators concluded that MAP violated Regulation 122 (written report of any incident that potentially affects safety, physical or emotional welfare of child/youth within 24 hours); Regulation 201 (prohibition on the use of excessive force); Regulation 401 (program shall not hire or continue to employ persons whose behavior may endanger children/youth); Regulation 403 (facility must maintain sufficient number of staff); Regulation 416 (staff shall receive training in the prevention and use of restraint); Regulation 423 (program shall establish procedures for adequate communication and support among staff to provide services to children/youth); Regulation 648 (program shall prohibit the use of cruel, severe or unnecessary practices); Regulation 650 (program shall not use any form of restraint without prior approval); and Regulation 651 (restraint may only be used to ensure the immediate safety of the child/youth).

208. RTPRI investigators interviewed Todd Fountain of JKM Training.

209. In December 2019, DCF notified the federal court that it had implemented a new policy requiring Woodside staff to employ de-escalation techniques included in the nationally-recognized Safe Crisis Management system.

210. JKM Training was hired by DCF to train Woodside staff in the techniques included in the Safe Crisis Management System.

211. Fountain told RTPRI investigators that Woodside staff members were told by Defendant Simons "to go back to the old techniques if [the Safe Crisis Management techniques were not] working."

212. Fountain suggested that Defendant Simons might be "sabotaging its implementation" in an effort to prove that "what they were doing [before the federal court intervened] was good."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

213. According to Fountain, the conduct of Woodside/MAP staff exhibited the belief that "intimidation is a behavior-management strategy."

214. On June 29, 2020, A.L. was again assaulted by Woodside/MAP staff, led by Defendant Hamlin.

215. During the assault, A.L. was knocked to the floor, A.L.'s arms were twisted and pulled behind his back, and A.L.'s legs were crossed while his feet were moved up against his buttocks.

216. In its August 2019 order, the federal court specifically banned the further use of this painful and unnecessary restraint technique ("The focus of forcing youths into the final position – arms raised behind the back, feet crossed and pushed into the buttocks – results in prolonged struggles on the floor").

217. On July 7, 2020, Disability Rights Vermont reported the two assaults to the federal court.

218. According to Disability Rights Vermont, a "review of the video of the June 29, 2020 incident regarding two youths confirms that the same, or even more dangerous, pain-inflicting maneuvers that existed prior to this litigation were used again, despite this Court's Preliminary Injunction Order and Order approving the Settlement Agreement."

219. In August 2020, newly-appointed DCF Commissioner Sean Brown told Vermont State legislators that when Woodside staff members assaulted A.L., they "ultimately reverted to some techniques that aren't supported by the new model that we're using in the facility."

220. According to Commissioner Brown, Woodside staff restrained A.L. "in a way that's inappropriate in a prone position."

## CAUSES OF ACTION

### COUNT ONE
### Conspiracy to violate the Eighth Amendment's ban on
### cruel and unusual punishment

221. Plaintiffs repeat and incorporate herein paragraphs 1 through 220.

222. At all times material hereto, Defendants were acting under color of state law.

223. The Eighth Amendment guarantees Plaintiffs' right to be free from cruel and unusual punishment.

224. Defendants were vested with control over the custody and care of Plaintiffs.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

25

225. Defendants owed a duty of care to Plaintiffs to ensure that their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

226. Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants conspired to unlawfully isolate Plaintiffs in seclusion cells in Woodside North Unit, to physically restrain them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution in violation of 42 U.S.C. §1985.

## COUNT TWO
### Conspiracy to violate the Eighth Amendment and Fourteenth Amendment' s ban on the use of excessive force

227. Plaintiffs repeat and incorporate herein paragraphs 1 through 226.

228. At all times material hereto, Defendants were acting under color of state law.

229. Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants conspired to unlawfully isolate Plaintiffs in seclusion cells in Woodside North Unit, to physically restrain them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from excessive force as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1985.

## COUNT THREE
### Conspiracy to violate Plaintiffs' right to due process of law as guaranteed by the Fourteenth Amendment

230. Plaintiffs repeat and incorporate herein paragraphs 1 through 229.

231. At all times material hereto, Defendants were acting under color of state law.

232. The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

233. Defendants were vested with control over the custody and care of Plaintiffs.

234. Defendants owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

235. Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants conspired to unlawfully isolate

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Plaintiffs in seclusion cells in Woodside North Unit, to physically restrain them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1985.

## COUNT FOUR
### Defendants violated the Eighth Amendment's ban on cruel and unusual punishment

236. Plaintiffs repeat and incorporate herein paragraphs 1 through 235.

237. At all times material hereto, Defendants were acting under color of state law.

238. The Eight Amendment guarantees Plaintiffs' right to be free from cruel and unusual punishment.

239. Defendants were vested with control over the custody and care of Plaintiffs.

240. Defendants owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

241. Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants unlawfully isolated Plaintiffs in seclusion cells in Woodside's North Unit, physically restrained them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

## COUNT FIVE
### Defendants violated the Eighth Amendment and Fourteenth Amendment's ban on the use of excessive force

242. Plaintiffs repeat and incorporate herein paragraphs 1 through 241.

243. At all times material hereto, Defendants were acting under color of state law.

244. The Eighth Amendment and Fourteenth Amendments guarantees Plaintiffs' right to bodily integrity and to be secure in their person and free from excessive force.

245. The Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.

246. The use of force by Defendants shocks the conscience.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

247. The Defendants used such force as was objectively unreasonable, excessive, and conscience shocking physical force.

248. None of the Defendants took reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking excessive force of other Defendants despite being in a position to do so.

249. The individual Defendants acted in concert and joint action with each other.

250. The aforementioned acts of Defendants were perpetrated against Plaintiffs without legal justification. The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

251. While Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants unlawfully isolated Plaintiffs in seclusion cells in Woodside North Unit, physically restrained them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from excessive force as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983.

## COUNT SIX
### Defendants deprived Plaintiff of their right to due process of law as guaranteed by the Fourteenth Amendment

252. Plaintiffs repeat and incorporate herein paragraphs 1 through 251.

253. At all times material hereto, Defendants were acting under color of state law.

254. The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

255. Defendants were vested with control over the custody and care of Plaintiffs.

256. Defendants owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

257. Defendants violated Plaintiffs' Fourteenth Amendment rights when they confined, restrained, treated, and punished Plaintiffs in the aforementioned manner.

258. Defendants deprived Plaintiffs of their protected liberty interest by punishing, restraining, and confining Plaintiffs in the manner aforementioned.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

259. The aforementioned acts of Defendants were perpetrated against Plaintiffs without legal justification.  The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

260. Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants unlawfully isolated Plaintiffs in seclusion cells in Woodside North Unit, physically restrained them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

### COUNT SEVEN
**Defendants were deliberately indifferent to the violations
of Plaintiffs' rights perpetrated by staff members at the
Natchez Trace Youth Academy**

261. Plaintiffs repeat and incorporate herein paragraphs 1 through 260.

262. At all times material hereto, Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott were acting under color of state law.

263. The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

264. Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott were vested with control over the custody and care of Plaintiffs.

265. Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

266. Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott ignored complaints about the inhumane conditions at the Natchez Trace Youth Academy registered by Plaintiffs R.H. and D.H., demonstrating deliberate indifference to the repeated violations of R.H.'s and D.H's civil and constitutional rights which directly and negatively impacted their physical safety and emotional well-being in violation of their (a) right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution; (b) right to be free from excessive force as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution; and (c) right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

## COUNT EIGHT
### Conspiracy to violate the First Amendment's Right to Petition the Government for a Redress of Grievances

267. Plaintiffs repeat and incorporate herein paragraphs 1 through 266.

268. At all times material hereto, Defendants were acting under color of state law.

269. The First Amendment guarantees Plaintiffs' right to petition the government for a redress of grievances.

270. Defendants were vested with control over the custody and care of Plaintiffs.

271. In 2018, while Plaintiffs R.H. and T.F. were detained at Woodside, Defendants conspired to retaliate against R.H. and T.F. after they registered complaints about the abuse they suffered at Woodside in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' First Amendment rights in violation of 42 U.S.C. §1985.

## COUNT NINE
### Defendants violated R.H.'s and T.F.'s First Amendment's Right to Petition the Government for a Redress of Grievances

272. Plaintiffs repeat and incorporate herein paragraphs 1 through 271.

273. At all times material hereto, Defendants were acting under color of state law.

274. The First Amendment guarantees Plaintiffs' right to petition the government for a redress of grievances.

275. Defendants were vested with control over the custody and care of Plaintiffs.

276. In 2018, while Plaintiffs R.H. and T.F. were detained at Woodside, Defendants retaliated against R.H. and T.F. after they registered complaints about the abuse they suffered at Woodside in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' First Amendment rights in violation of 42 U.S.C. §1983.

## DAMAGES – COUNTS ONE THROUGH NINE

277. Plaintiffs repeat and incorporate herein paragraphs 1 through 276.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

278. As a result of Defendants' outrageous, illegal, unconstitutional, and unlawful conduct, Plaintiffs suffered serious physical and psychological injuries, both temporary and permanent, and are entitled to compensatory damages resulting from those injuries.

279. Based on Defendants' willful and wanton disregard for, and deliberate indifference to, Plaintiff's constitutional rights, Plaintiffs are entitled to exemplary damages.

280. In addition, Defendants are liable to Plaintiffs for those damages pursuant to 42 U.S.C. §1983 and §1985 and for their attorney's fees and litigation expenses pursuant to 42 U.S.C. §1988.

## PENDENT STATE CLAIMS

## COUNT TEN
### Assault and Battery

281. Plaintiffs repeat and incorporate herein paragraphs 1 through 281

282. While Plaintiffs were detained at Woodside and the Middlesex Adolescent Program between 2016 and 2020, Defendants repeatedly placed them in isolation cells in the North Unit and physically assaulted them.

### Damages for Assault and Battery

283. As a result of Defendants' outrageous, illegal, unconstitutional, and unlawful conduct, Plaintiffs suffered serious physical and psychological injuries, both temporary and permanent, and are entitled to compensatory damages resulting from those injuries.

284. Based on Defendants' intentional misconduct, Plaintiffs are also entitled to exemplary damages.

## COUNT ELEVEN
### Intentional Infliction of Emotional Harm

285. Plaintiffs repeat and incorporate herein paragraphs 1 through 285.

286. Defendants were vested with control over the custody and care of Plaintiffs.

287. Defendants' confinement, restraint, treatment, and punishment of Plaintiffs was so outrageous and extreme as to go beyond all possible bounds of decency.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

288. Defendants intended to cause emotional distress to Plaintiffs or acted in reckless disregard of the probability of causing emotional distress to Plaintiffs.

289. Plaintiffs have suffered and continue to suffer emotional distress.

290. The aforementioned acts of Defendants were perpetrated against Plaintiffs without legal justification.  The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

291. By repeatedly placing Plaintiffs in isolation cells in Woodside North Unit and by physically assaulting them, Defendants' outrageous and inexcusable conduct caused Plaintiffs to suffer from extreme emotional distress.

### DAMAGES
### Intentional Infliction of Emotional Harm

292. As a result of Defendants' intentional infliction of emotion harm, Plaintiffs are entitled to both compensatory and exemplary damages.

### COUNT TWELVE
### Defendants' grossly negligent and reckless supervision
### of persons in their custody and control

293. Plaintiffs repeat and incorporate herein paragraphs 1 through 293.

294. By statute, Defendants were vested with control, custody, and supervision of Plaintiffs and had a duty to protect Plaintiffs from foreseeable harm.

295. Defendants owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs

296. As a result of their grossly negligent and reckless conduct, Defendants breached their duty of care to Plaintiffs.

### DAMAGES – Grossly negligent and reckless supervision

297. As a result of Defendants' breach of their duty of care to Plaintiffs, Plaintiffs suffered physical and emotional harm, both temporary and permanent, for which they are entitled damages and other compensation in an amount to be determined by the jury.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

WHEREFORE, Plaintiffs request that this Court:

1.    enter judgment in their favor on all counts of the Complaint;

2.    award Plaintiffs compensatory damages in an amount to be determined by the Court;

2.    award medical expenses related to the treatment of Plaintiffs' injuries, which are claimed as special damages, Fed.R.Civ.Pro. 9(g);

3.    award exemplary damages for Defendants' outrageous and illegal conduct;

5.    award Plaintiffs attorney's fees and expenses pursuant to 42 U.S.C. § 1988;

6.    grant such other and further relief as this Court deems proper.

Plaintiffs hereby demand a trial by jury.

DATED at Burlington, Vermont this 13th day of December, 2021.

Respectfully submitted,

Brooks G. McArthur, Esq.
Jarvis, McArthur & Williams
P.O. Box 902
Burlington, VT 05402
(802) 658-9411
bmcarthur@jarvismcarthur.com

David J. Williams, Esq.
Jarvis, McArthur & Williams
P.O. Box 902
Burlington, VT 05402
(802) 658-9411
dwilliams@jarvismcarthur.com

Counsel for Plaintiffs

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

33