UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 JUN 28  PM 3: 21

CLERK

BY_____
DEPUTY CLERK

CATHY WELCH, ADMINISTRATOR OF THE
ESTATE OF G.W., R.H., T.W., T.F.,
D.H., B.C., and A.L. by next friend Norma Labounty.

              Plaintiffs,                     Docket No. 5:21-cv-283

           V.

KENNETH SCHATZ, KAREN SHEA,
CINDY WOLCOTT, BRENDA GOOLEY,
JAY SIMONS, ARON STEWARD, MARCUS BUNNELL,
JOHN DUBUC, WILLIAM CATHCART,
BRYAN SCRUBB, KEVIN HATIN,
NICHOLAS WEINER, DAVID MARTINEZ,
CAROL RUGGLES, TIM PIETTE,
DEVIN ROCHON, AMELIA HARRIMAN,
EDWIN DALE, MELANIE D'AMICO,
ERIN LONGCHAMP, CHRISTOPHER HAMLIN,
and ANTHONY BRICE, all in their individual capacities.

              Defendants.

## AMENDED COMPLAINT AND JURY TRIAL DEMAND

### INTRODUCTION

      Between 2016 and 2020, juveniles detained at the Woodside Juvenile Rehabilitation Center in Essex, Vermont and the Middlesex Adolescent Center were subjected to obscene abuse at the hands of state officials who were charged with their care and supervision. On a regular basis, vulnerable children, some of whom had been physically, mentally, and/or sexually abused by caregivers before they were taken into state custody and sent to Woodside, were physically assaulted and sometimes stripped of their clothing by Woodside staff members who demanded compliance with their orders. Many times, these same children were then confined to isolation cells in Woodside's so-called "North Unit" for days, weeks, and sometimes months at a time.

      Complaints regarding this misconduct were investigated and substantiated by state investigators who, by October 2018, informed state officials that the abuse violated state regulations and had to stop. Despite these warnings, state officials in charge of Woodside disregarded the findings and continued to abuse and isolate vulnerable children through August 2019, when a federal court issued an injunction ordering a halt to such practices.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Even though the court ordered a halt to the abusive tactics developed by Jay Simons for use against Woodside detainees, the abuse of children by DCF staff members then continued at a different facility in Middlesex, Vermont. An internal investigation into the assault of one of these children in April 2020 revealed that Woodside/Middlesex Adolescent Center Director Simons was actively "sabotaging" the implementation of a different crisis management system in an effort to prove that "what they were doing [before federal court intervention] was good."

This lawsuit is brought on behalf of seven young people who were abused by DCF staff members at Woodside and the Middlesex Adolescent Center. Sadly, one of these vulnerable victims, G.W., died of an accidental drug overdose in October 2021. Her claim is being pursued by her estate, which was established for the sole purpose of pursuing justice in her memory.

In addition, DCF sent two of these young people to an out-of-state facility in Tennessee called Natchez Trace Youth Academy where they suffered physical and emotional abuse by its staff members. Specific complaints about the mistreatment of one of these boys in 2017 were disregarded by DCF employees months before DCF sent the second boy to Natchez Trace where he suffered similar abuse.

## PARTIES

1. Plaintiff Cathy Welch is a resident of Corinth, Vermont and was appointed administrator of the Estate of G.W. by the Orange County Probate Court on December 5, 2021.

2. Plaintiff R.H. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

3. Plaintiff T.W. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

4. Plaintiff T.F. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

5. Plaintiff D.H. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

6. Plaintiff B.C. is over the age of 18 and, at all times relevant to this Complaint, was a resident of Vermont.

7. Plaintiff A.L. is a minor who resided in Vermont at all times relevant to this Complaint and his claims are brought on his behalf by his mother, Norma Labounty.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

2

8. Defendant Kenneth Schatz was the Commissioner of Vermont's Department for Children and Families (DCF) at all times relevant to this Complaint.

9. Defendant Karen Shea was a Deputy Commissioner of Vermont's Department for Children and Families at all times relevant to this Complaint.

10. Defendant Cindy Wolcott was a Deputy Commissioner of Vermont's Department for Children and Families at all times relevant to this Complaint.

11. Defendant Brenda Gooley was the Director of Policy and Operations of Vermont's Department for Children and Families at all times relevant to this Complaint.

12. Defendant Jay Simons was the Director of the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

13. Defendant Kevin Hatin was an Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

14. Defendant Aron Steward was the Clinical Director at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

15. Defendant Marcus Bunnell was an Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

16. Defendant John Dubuc was an Operations Supervisor at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

17. Defendant William Cathcart was a staff member and assistant director at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

18. Defendant Bryan Scrubb was a staff member and clinician at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

19. Defendant Nicholas Weiner was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

20. Defendant David Martinez was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

21. Defendant Carol Ruggles was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

3

22. Defendant Tim Piette was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

23. Defendant Devin Rochon was a staff member at the Woodside Juvenile Rehabilitation Center, Essex, Vermont at all times relevant to this Complaint.

24. Defendant Amelia Harriman was employed by DCF at all times relevant to this Complaint.

25. Defendant Melanie D'Amico was employed by DCF as residential services manager at all times relevant to this Complaint.

26. Defendant Edwin Dale was employed by DCF at all times relevant to this Complaint.

27. Defendant Erin Longchamp was employed by DCF at all times relevant to this Complaint.

28. Defendant Christopher Hamlin was employed by DCF at all times relevant to this Complaint.

29. Defendant Anthony Brice was employed by DCF at all times relevant to this Complaint.

30. DCF is the Vermont state agency that is responsible for making sure children and youth are safe from abuse, have their basic needs met, and live in safe, supportive, and healthy environments.[1]

31. Because children detained at Woodside were in the custody of DCF, all of these defendants had a "special relationship" with G.W., R.H., T.W., B.C., T.F., A.L., and D.H.

32. Because of the defendants' "special relationship" with their wards held at Woodside, each of them had a constitutional duty enforceable through the Due Process Clause of the Fourteenth Amendment to the United States Constitution to protect G.W., R.H., T.W., B.C., T.F., A.L., and D.H. from harm, including physical abuse, excessive force, and solitary confinement in the North Unit.

33. Defendants Schatz, Shea, Wolcott, Gooley, Simons, Steward, Bunnell, Dubuc, Cathcart, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, D'Amico, Hamlin, and Brice either directly participated in the physical abuse of G.W., R.H., T.W., B.C., T.F., A.L., and D.H. and the use of solitary confinement, and/or failed to fulfill their constitutional obligation to protect G.W., R.H., T.W., B.C., T.F., A.L., and D.H. from these abusive and reprehensible practices.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[1] *See* DCF.vermont.gov/protection/services.

34. In addition, because Defendants Schatz, Shea, Gooley, Wolcott, Dale, and Longchamp ignored repeated warnings about the unsafe conditions at the Natchez Trace Youth Academy and transferred R.H. and D.H. to that facility where they were subjected to unspeakable physical and mental abuse, those defendants failed to fulfill their constitutional obligation to protect R.H. and D.H. from the foreseeable mental and physical harm that befell them after those boys were dispatched to Natchez Trace.

## JURISDICTION AND VENUE

35. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331, as it presents a federal question, and 28 U.S.C. §1343(a)(3).

36. The Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

37. Venue is proper pursuant to 28 U.S.C. §1391(b), as this is the judicial district in which the events related to this Complaint occurred.

## CONDITIONS AT WOODSIDE

38. DCF's Woodside Juvenile Rehabilitation Center was defined as follows: It "shall be operated by the Department for Children and Families as a residential treatment facility that provides in-patient psychiatric, mental health, and substance abuse services in a secure setting for adolescents who have been adjudicated or charged with delinquency or criminal act." 33 V.S.A. § 5801(a).

39. Juveniles detained at Woodside were informed that they would be "treated in an appropriate way" and that Woodside is "violence free – free of fighting, slapping, hitting, or physical contact in any way."

40. Juveniles detained at Woodside were further informed that they had a right to (a) a "humane and safe environment;" (b) "[f]reedom from abuse, neglect, retaliation ("pay-back"), humiliation, harassment, and exploitation," and that "Woodside prohibits all cruel, severe, unusual, and unnecessary physical intervention and seclusion," and that physical restraints and seclusion would only be used as a "last resort."

41. From the outside, Woodside resembled an adult prison and had three living units, East, West, and North. The main units, East and West, housed between 13 and 15 residents each. These units contained "dry rooms" or cells that lack plumbing.

Woodside detainees assigned to the East and West Units were locked in their rooms at night and at designated times during the day. During the day, detainees

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

5

in the East and West Units were allowed to congregate in large communal "day rooms" for group activities.

42. Woodside's "North Unit" contained three "wet rooms" or cells that had a sink and a toilet. The "wet rooms" eliminated the need to let a detainee held in one of these isolation cells out to use the bathroom. The North Unit also contained a padded "safe room" that was typically used for seclusion and a small windowless "day room" containing a shower and a table. Woodside staff members performed strip searches of detainees in the North Unit's "day room."

43. Woodside detainees who engaged in disruptive, aggressive, or self-harming behaviors would be confined to North Unit for days or weeks without access to education, recreation, or regular programming. Sometimes, detainees isolated in the North Unit would not be permitted to leave their cell to access the day room or shower.

44. Woodside detainees confined in the North Unit were not allowed to flush their toilets and had to ask staff to flush away their waste. Detainees would sometimes have to sit with unflushed human waste for significant periods of time.

45. Woodside detainees confined to the North Unit had an earlier bedtime than detainees held in the East or West Units and could not choose their own food. North Unit's detainees thus had to eat whatever staff members delivered to the isolation cells.

46. In some situations, Woodside detainees held in the North Unit were not allowed to have any possessions in their isolation cells, including a mattress, bedding, books, or a paper or pencil.

47. On occasion, Woodside detainees held in the North Unit had their clothing cut off or otherwise removed and were left in isolation cells wearing nothing but their underwear or paper gowns. Sometimes children were left nude or without clothing from the waist down. For example, G.W. was held naked overnight on more than one occasion and B.C. was naked from the waist down for two full days.

48. After he was named Woodside's director in 2011, Defendant Simons introduced a use-of-force system he called "Dangerous Behavior Control Tactics," (DBCT) that had been used in adult prison facilities where he had been a use-of-force instructor for the Department of Corrections.

49. Under the direction of Defendant Simons, Woodside staff members, including Defendants Cathcart, Hatin, Piette, Bunnell, Dubuc, Brice, Weiner, Martinez, and Rochon, would apply rotational pressure to a juvenile's joints, including wrists, shoulders, and knees, and hyperextend shoulder and rotator cuff muscle groups.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

6

50. The use of Simons' techniques sometimes caused excruciating pain and could lead to swelling and the possibility of limited range of motion.

51. The pain compliance techniques employed at Woodside are contrary to national standards and Vermont law that prohibits the use of "pain inducement to obtain compliance" and "hyperextension of joints." VT ADC 12-3-508: 600 (648).

52. In October 2016, an attorney from the Office of the Juvenile Defender registered a complaint with Defendant Dale about the placement of Woodside detainees in isolation cells "for weeks on end – the isolation is bad for their mental health."

53. Defendant Dale forwarded the Juvenile Defender's complaint to Defendants Simons and Steward.

54. On December 2, 2016, the attorney from the Office of the Juvenile Defender participated in a meeting to discuss the conditions of confinement in the North Unit with Defendants Simons and Shea.

55. Defendant Simons made an audio recording of that meeting and a transcript of the meeting has been prepared.

56. The meeting focused on the conditions of G.W.'s confinement in the North Unit (then known as the ICU), who was 13 years old at the time.

57. The attorney from the Office of the Juvenile Defender described in detail what was happening with her client, G.W., while G.W. was held in isolation.

58. The cell G.W. was held in was filthy, the toilet did not flush, and people entering the room had to mask the odor by using Vick's VapoRub.

59. G.W. had gained so much weight that the attorney noticed stretch marks on G.W.'s skin.

60. The attorney from the Office of the Juvenile Defender explained that such dramatic weight gain might have serious medical consequences, particularly since G.W. was prescribed anti-psychotic drugs.

61. G.W. had limited access to clothing and her hygiene was so poor that she smelled badly during a recent court appearance.

62. G.W. was not allowed to go outside to exercise, something that would have seriously impact a child who grew up in the country and was used to spending lots of time outdoors.

63. In addition, G.W. was not being provided with appropriate educational services.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

64. G.W.'s attorney was particularly concerned "about the psychological effect of not having any clothes and of being – being naked all the time in front of male staff."

65. G.W.'s attorney, who formally worked at DCF as a child abuse investigator, continued: "I think if we had a situation, again, to analogize to if this was apparent (sic) doing this to their child to control the child's mental health issues and this was not a facility doing this stuff, we would look at this as abuse. We would look at it in a very different way that we look at it here."

66. Defendant Shea agreed to look into the attorney's complaints and get back to her because "I know that there are other forums where this is being discussed."

67. In a letter dated December 2, 2016, Defendant Shea dismissed these complaints and suggested that G.W. needed to be held in solitary confinement for her own good.

68. Since this letter is dated the same day as G.W.'s attorney registered her complaints about G.W.'s conditions of confinement at Woodside, it is highly unlikely that Defendant Shea conducted an investigation into the specific allegations of potential child abuse brought to her attention earlier in the day.

69. When the Office of the Juvenile Defender registered complaints about the conditions of confinement at Woodside, Woodside officials, including Defendants Simons, Steward, and Bunnell, retaliated against the juveniles on whose behalf the complaints had been made, interfered with their right to counsel, and pressured R.H. and T.F. to sign notes to their attorneys indicating that they should withdraw motions for a protective orders filed in the Vermont Superior Court, Family Division.

70. No later than August 2018, DCF management officials, including Defendants Schatz, Shea, D'Amico, and Gooley, were aware of the conditions of confinement in Woodside's North Unit and the physical abuse of Woodside residents for a number of reasons.[2]

71. Between May 2018 and July 2019, the Defender General's Office of the Juvenile Defender filed a series of motions in Vermont's family courts requesting orders prohibiting Woodside staff from using excessive restraints and pain compliance techniques against Woodside detainees and housing detainees in the North Unit's isolation cells.

---

[2] In July 2018, R.H. asked the Vermont Superior Court to order Defendant Schatz to stop using painful restraints and isolation. G.W.'s attorney told Defendant Shea about the intolerable conditions in the North Unit in December 2016. In August 2018, Defendant D'Amico witnessed B.C. pant-less in her North Unit cell. In December 2017, Defendant Gooley received a copy of Defendant Simons' denial of A.L.'s grievance that he had been subjected to solitary confinement in the North Unit.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
R O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

72. In May 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order in the Vermont Superior Court, Rutland Family Division, on behalf of T.W., who was a Woodside detainee.

73. The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents to stop restraining [T.W.] unnecessarily and in violation of state regulations, stop using dangerous restraint techniques designed to induce pain …"

74. ~~In~~ On July **6,** 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order in the Vermont Superior Court, Franklin Family Division, on behalf of R.H. who was a Woodside detainee.

75. The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents to stop subjecting [R.H. to] unnecessary physical restraint, stop using dangerous restraint techniques designed to induce pain, stop subjecting him to seclusion and solitary confinement in violation of applicable state regulations…"

76. The complaint alleged that on April 17, 2018, Defendants Simons, Cathcart, and Martinez entered R.H.'s North Unit cell and proceeded to restrain him and strip the room of all of his belongings, including his bedding.

77. On April 18, 2018, Defendants Dubuc, Martinez, Rochon, and Weiner entered R.H.'s North Unit cell and proceeded to restrain him by pinning him face-down on his bed, and used a cutting tool to cut his shirt off of his body.

78. On May 4, 2018, Defendant Steward stood over R.H. as several large male Woodside staff members pinned R.H. to the ground and warned R.H. that they would take his cloths away if he could not be "safe" with them.

79. The Complaint indicates that there is a video recording of this incident.

80. During the May 4, 2018 restraint, Defendant Weiner "dug his finger into the pressure point on [R.H.'s] jaw and applied pressure to [his] neck to cause him pain."

81. Although they were mandated by state law to report Defendant Weiner's abusive conduct, Defendant Steward and others did not report what they had just witnessed to the appropriate authorities.

82. Finally, the complaint alleged that R.H. had been subjected to extended periods of solitary confinement in the North Unit and that on July 3, 2018, he was not allowed to speak with his attorney or meet with an expert hired by The Office of the Juvenile Defender "to evaluate the impact of Woodside's excessive use of restraint and seclusion with [R.H.]."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

83. On July 18, 2018, an attorney with the Office of the Juvenile Defender filed a Second Motion for an Emergency Protective Order on behalf of R.H. in the Vermont Superior Court, Franklin Family Division.

84. The second motion asked the court to issue an order requiring Defendant Schatz "and his agents to stop subjecting him to unnecessary physical restraint, stop using dangerous restraint techniques designed to induce pain, stop subjecting him to seclusion and solitary confinement in violation of applicable state regulations and stop subjecting him to forcible removal of his clothing during restraint."

85. The second motion alleged that since the first motion was filed, R.H. had, with a few exceptions, not been permitted to leave the North Unit and that he was "depressed as f---, because I'm in a f---ing box."

86. R.H. also alleged that Defendant Steward was trying to talk to him about his July 6, 2018 motion, telling him that "he was not going to get out of Woodside because he is 'already in the long-term program.'"

87. On August 22, 2018, the Office of the Juvenile Defender filed a Motion for an Emergency Protective Order in the Vermont Superior Court, Orleans Family Division, on behalf of B.C., who was a Woodside detainee.

88. The motion indicated that B.C. "has been restricted to the North Unit, deprived of clothing, and permitted extremely limited access to possessions and stimulating activities for four weeks as of this filing … She is forced to shower naked in front of staff, cannot wear clothing, and cannot have books, paper, or writing implements."

89. The motion was accompanied from a licensed psychologist's affidavit stating that "[m]aintaining [B.C.] in deprived conditions and not providing her with appropriate treatment with accommodations is detrimental to [her] ability to heal."

90. On April 4, 2019, the Office of the Juvenile Defender filed a Complaint for Emergency Injunctive Relief on behalf of Juvenile #1, N.B., who was a Woodside detainee, against Defendant Schatz.[3]

91. The Complaint asked the court to issue an order requiring Woodside to "immediately stop using the purposeful infliction of pain during restraints to achieve compliance and immediately stop using prone positions."

92. The Complaint alleged that N.B. had been subjected to "pain compliance" techniques "on his legs, arms, shoulders, and wrists that caused significant pain and swelling of his joints due to hyperextension."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P.O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[3] N.B. is not a party to this action.

93. On March 23, 2019, Juvenile #1 was locked in his cell in the North Unit and subsequently subjected to a video-recorded physical restraint involving several Woodside staff members.

94. The video shows the staff members forcing Juvenile #1 onto the floor of a "soothing room," holding him in a prone position with his arms raised "straight up in the air … the staff members appear to be twisting [Juvenile #1's] arms, particularly his right arm.

95. While this is happening, another staff member is "holding Juvenile #1's legs, crossed at the ankles, bent at the knees, and is forcefully pushing his feet into his buttocks."

96. During this restraint, which was ordered by Defendant Steward, "Juvenile #1 is struggling and repeatedly telling staff they were hurting him."

97. An affidavit executed by Paul Capcara, R.N. accompanied the Complaint and indicated that "the order to physically restrain Juvenile #1 was unjustified and an inappropriate response to suicidal ideation."

98. Relying on investigatory reports submitted to Defendant Schatz in October 2018 by DCF's Residential Licensing & Special Investigations Unit (RLSIU), the Complaint alleged that four other Woodside detainees had been subjected to the same painful techniques that RLSIU concluded had violated a regulation prohibiting "cruel, severe, unusual or unnecessary practices."

99. The four other detainees whose abuse was investigated by RLSIU are Plaintiffs R.H., T.W., B.C., and T.F.

100.    On June 20, 2019, the Defender General's Office of the Juvenile Defender filed a Verified Motion for a Protective Order in the Vermont Superior Court, Chittenden Family Division, on behalf of G.W.

101.    The Juvenile Defender's verified motion indicated that her client, who was a Woodside detainee, was subjected to excessive restraint and seclusion and the forcible removal of her clothing, and was forced to remain naked in the presence of a male staff member.

102.    The Juvenile Defender's motion asked the court to order "the Commissioner of the Department for Children and Families and his agents from confining [G.W.] in Woodside's segregation unit, subjecting her to excessive restraint and seclusion, subjecting her to forcible removal of her clothing, forcing her to remain naked in the presence of male staff…"

103.    The Juvenile Defender's verified motion included an affidavit executed by Paul Capcara, R.N., that reviewed Woodside's conditions of confinement,

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

describing in detail the use of pain compliance techniques and the excessive and inappropriate use of solitary confinement, to the detriment of Woodside detainees who were subject to these conditions of confinement.

104.    Capcara's affidavit ended with this statement: "I have repeatedly testified about my concerns regarding the unusual and harmful practices at Woodside for over a year. DCF's leadership has known about these dangerous conditions as the result of my testimony and that of other expert witnesses, as well as their own internal investigations. Despite this knowledge, the dangerous and harmful practices persist."

105.    On June 24, 2019, the Vermont Superior Court held a hearing on G.W.'s motion and heard the testimony of Dr. Christopher Bellonci.

106.    Dr. Bellonci testified that "Woodside had placed [G.W.] at risk of physical and psychological harm by repeatedly restraining her on the floor and stripping her naked, subjecting her to dangerous and painful restraint techniques, and involuntarily escorting her down a flight of stairs. Dr. Bellonci explained that the involuntary removal of clothing and forced nudity are particularly damaging to someone [like G.W.] who has been a victim of sexual assault."

107.    Following this hearing, on June 28, 2019[4], the Office of the Juvenile Defender filed a Verified Motion for an Ex Parte Protective Order in the Vermont Superior Court, Chittenden Family Division, asking the court to issue an order "restraining the Commissioner of the Department for Children and Families and his agents continuing to confine [G.W.] at Woodside and order the Commissioner and his agents to transfer [G.W.] to a hospital immediately."

108.    The motion indicated that on June 26, 2019, G.W.'s safety smock, along with her blanket, were forcibly removed by Woodside staff members and that Defendants Simons and Cathcart "grappled with [G.W.] while she was naked and

---

[4] Earlier that day, at 6:58 a.m., Defendants Dubuc and Martinez, along with two unidentified men dress in Tyvex suits, entered G.W.'s cell as she was lying naked on the floor. *See Paragraphs 384-388 below.*

Defendant Dubuc is wearing a blue shirt and shorts. Defendant Martinez is seen standing next to Dubuc. The two men in the Tyvex suits then drag G.W., who is face down, along the cell floor.

As G.W. screams, the two men in the Tyvex suits pull G.W.'s arms behind her back, while Defendant Dubuc stands over her naked body. The men are then seen retreating from the cell, leaving a still-screaming G.W. lying naked and alone on the floor as they close the feces-smeared cell door behind them.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

forced her back into her room." Shortly thereafter, Simons and Cathcart put their hands on G.W., who was naked, and " 'escorted' her involuntarily to her room."

109.  The following day, G.W. was "supposed to have a telephone interview with Dr. Bellonci," but someone at Woodside canceled the phone interview without prior notice.

110.  It was only after G.W.'s attorneys "reached out" to DCF's attorneys that G.W. was able to speak with Dr. Bellonci.

111.  During this call, G.W. revealed to Dr. Bellonci that a Woodside staff member "had been making sexual comments while watching her urinate" and that the staff member asked her "to do 'sexual things.'"

112.  After this call was completed, Woodside staff members removed her safety blanket, "leaving her naked."

113.  On June 27, 2019, four male Woodside staff members, including Defendant Simons, "restrained her while she was naked" after forcibly entering her cell.

114.  Emails from Defendants Dubuc, Bunnell, and Cathcart to Defendant Dale confirmed that they were involved in the incidents on June 24, 2019 and June 26, 2019 alleged in G.W.'s June 28, 2019 motion.

115.  In addition to the actions filed in Vermont state courts, a series of grievances were filed objecting to the conditions of confinement at Woodside.

116.  On December 29, 2017, an attorney with the Office of the Juvenile Defender filed a grievance on behalf of A.L.

117.  The grievance requested a prompt review of A.L.'s placement in solitary confinement in the North Unit and immediate release from the North Unit.

118.  In a memo dated December 29, 2017, Defendant Simons denied the grievance. Copies of Simons' memo were sent to Defendants Shea and Gooley.

119.  On January 2, 2018, an attorney with the Office of the Juvenile Defender filed another grievance on behalf of A.L.

120.  The grievance complained about the use of so-called "resets" that required an offending detainee to be secluded in a locked room, and requested a cessation of the use of these "resets."

121.  On December 17, 2017, an attorney with the Office of the Juvenile Defender filed a grievance on behalf of D.H.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

122.     The grievance alleged improper placement of D.H. into solitary confinement in the North Unit and that Defendants Simons and Cathcart had provided contradictory reasons for sending D.H. into the North Unit.

123.     In addition, the grievance indicates that the attorney from the Office of the Juvenile Defender asked Defendant Steward to reconsider her order sending D.H. into solitary confinement because "it was not in line with applicable policy" and that Steward denied the request.

124.     The grievance requested a prompt review of Defendants Simons' and Steward's decision to send D.H. into solitary confinement in the North Unit and immediate release from the North Unit.

125.     In a memo dated December 18, 2017, Defendant Simons denied the grievance.

126.     On August 14, 2017, an attorney with the Office of the Juvenile Defender filed a grievance with Defendant Simons on behalf of B.C.

127.     B.C.'s grievance complained that B.C. suffered a sprained ankle while being restrained by two male Woodside staff members on July 29, 2017.

128.     On August 17, 2017, an attorney with the Office of the Juvenile Defender filed a second grievance with Defendant Gooley on behalf of Plaintiff B.C.

129.     The grievance indicated that because Defendant Simons improperly restrained on August 13, 2017, the attorney asked Defendant Gooley to review both the original grievance related to the July 29, 2017 restraint and the second restraint involving Defendant Simons.

130.     On May 5, 2018, an attorney with the Office of the Juvenile defender filed a grievance on behalf of R.H.

131.     The grievance complained about R.H.'s confinement in the North Unit and Defendant Weiner's unlawful conduct during the May 4, 2018 restraint as detailed in the Complaint subsequently filed by the Office of the Juvenile Defender on July 6, 2018.

132.     R.H.'s grievance requested that Woodside immediately release him from the North Unit, refrain from "forced stripping" or "otherwise using the cutting tool to remove his clothing that he is wearing," and preserve video recordings of the April 18, 2018 incident.

133.     Defendant Simons subsequently denied R.H.'s grievance.

134.     On May 9, 2018, an attorney with the Office of the Juvenile defender filed an amended grievance and appeal on behalf of R.H.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

135.     R.H.'s amended grievance requested his immediate release from the North Unit, the cessation of painful physical restraints, preservation of video recordings of restraints used on R.H., and "appropriate training and ongoing supervision to the involved staff members, particularly where repeated grievances from multiple sources have identified a pattern of concern with a staff member's conduct toward residents."

136.     R.H.'s amended grievance complained about an unnecessary and inappropriate restraint on May 4, 2018 during which Defendant Weiner applied pressure to R.H.'s neck and dug his finger into a "pressure point" causing R.H. to "experience significant pain."

137.     After the incident, R.H.'s attorney met privately with him and observed that there were no personal possessions in R.H.'s cell and that his "toilet was also clogged and was nearly overflowing with dirty brown water."

138.     The amended grievance indicated that R.H's conditions of confinement were "unsuitable for an animal" and that "[p]erhaps DCF can agree that there is no justification sufficient to permit keeping a child in conditions that - if inflicted upon an animal – would constitute 'cruelty' (i.e., depriving a youth of water, confining him half-naked to a cold dark cell for four continuous days, forcing him to live with raw sewage rendering his toilet unusable for half a day, or denying him a shower and forcing him to sit with feces on his person and in his living space)."

139.     DCF's Residential Licensing & Special Investigations Unit (RLSIU) was responsible for conducting investigations into complaints related to the conditions of confinement at Woodside.

140.     On October 23, 2018, DCF held a Woodside Stakeholder Meeting. Defendant Schatz attended the meeting. The following day, the Juvenile Defender sent Defendant Schatz a follow-up email detailing the deplorable conditions of confinement.

141.     In that email, the Juvenile Defender explained to Defendant Schatz that "I have seen things at [Woodside] that if perpetrated by a parent, would have likely resulted in substantiation, removal [of the child from the home], and criminal prosecution. As a former DCF investigator, it takes a lot to shock and dismay me. I am shocked and dismayed at Woodside on a regular basis. Moreover, the lack of accountability for staff who hurt residents and perpetrate a culture of silence in the face of resident mistreatment is deeply troubling."

142.     In October 2018, after RLSIU investigated complaints related to the treatment of R.H., T.W., T.F., and B.C. at Woodside, RLSIU investigators filed reports concluding that Woodside staff members violated Vermont law.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

143.     RLSIU investigated R.H.'s conditions of confinement at Woodside, the use of painful physical restraints, and Defendant Steward's interference with his right to counsel.

144.     In particular, RLSIU concluded that Woodside's attempt to silence R.H. violated Regulation 201; the use of Defendant Simons' pain compliance techniques violated Regulation 648; depriving detainees meals, water, rest, or opportunity for toileting violated Rule 648; the repeated use of physical restraints without due cause violated Rule 651; the failure to constantly monitor detainees in solitary confinement violated Rule 660; the failure to regularly flush the toilets in North Unit's isolation cells violated Regulation 718; and the use of North Unit's isolation rooms to seclude Woodside's detainees violated Regulation 718.

145.     In November 2018, after RLSIU investigated a different complaint filed by the Juvenile Defender on behalf of T.W., the investigators concluded that Woodside staff members violated Vermont law.

146.     In particular, based on this investigation, RLSIU concluded that Woodside's use of Defendant Simons' pain compliance techniques violated Regulation 648 and 650; Woodside's inappropriate use of restraints violated Regulation 651; and Woodside's failure to monitor T.W. when she was placed in a North Unit seclusion cell violated Regulation 660.

147.     Based on this investigation, RLSIU investigators informed the "Governing Authority," i.e., DCF, that it had "to provide RLSIU a plan to address the identified areas of Non-Compliance and areas of Compliance, but with Reservations, with the intent to come into full compliance [with Vermont's Residential Treatment Program Regulations] by November 16, 2018."

148.     On August 31, 2018, Paul Capcara filed a complaint with RLSIU indicating that he had reviewed a video recording of staff members as they physically restrained B.C. while placing her in the North Unit.

149.     According to the complaint, the video showed the male staff members who restrained the young woman, leaving her naked from the waist down in her isolation cell.

150.     A psychologist further reported that the detainee was not provided with bedding or adequate clothing or coverage for her lower body for 48 hours.

151.     RLSIU investigators reported that they had reviewed three videos of the incident. The investigators provided the following description of the third video:

"[Defendant] Hatin debriefs with the camera and says 'Ok, per [Defendant] Steward and [Defendant] Simons, any loose clothing that has been ripped, based on [the detainee's] history we were directed to remove it from her room…' He

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

talks to [the detainee] through the door and asks 'Are you going to hand it to me or not?' [Defendant] Hatin waits 5 seconds (as counted on the video) and responds, 'Well we'll take that as a "no".' Then [Defendant] Hatin and two other male staff members enter the room and begin struggling to restrain [the detainee] as she is screaming 'Don't touch me.' One male staff member is at a tug of war with [the detainee] for the ripped sweatpants. During this time, [the detainee] is being moved around on the floor with her buttocks and vulva exposed. [A youth counselor] removes partial elastic from [the detainee's] upper torso with a cutting tool. As the restraint is ending, [the detainee] is silent in the fetal position."

152.    After completing the investigation into Capcara's complaint, RLSIU investigators concluded that Woodside violated Regulation 201 when B.C. "was left with the lower half of her body uncovered for two days. [B.C.] was not provided a mattress, blanket or safety smock. [B.C.] was restrained and secluded without appropriate therapeutic supports." Furthermore, there was "no justification for the removal of [B.C.'s] bedding and food. [B.C.] was left without clothing for the lower half of her body for two days," in violation of Regulation 648.

153.    The RLSIU investigators also concluded that Woodside was in violation of Regulation 650 when staff members inappropriately restrained the female detainee.

154.    Based on this investigation, RLSIU investigators informed the "Governing Authority," i.e., DCF, that DCF had to "provide RLSI a plan to address the identified areas of Non-Compliance and Compliance, but with Reservations, with the intent to come into full compliance [with Vermont's Residential Treatment Program Regulations] by November 16, 2018."

155.    On July 5, 2018, an attorney with the Office of the Juvenile Defender filed a complaint in the Vermont Superior Court alleging that Defendants Bunnell and Piette improperly restrained and injured T.F.

156.    Subsequently, RLSIU investigated an incident that occurred on June 27, 2018 during which Defendants Piette and Bunnell again restrained T.F. and injured her.

157.    In particular, based on this investigation, RLSIU concluded that Defendant Bunnell's conduct violated Regulation 201 (A Residential Treatment Program shall insure children/youth the following rights: To be free from harm by caregivers or others, and from unnecessary or excessive use of restraint and seclusion/isolation); Regulation 648 (prohibition of pain inducement techniques and hyperextension of joints); and, Regulation 651 (restraint shall only be used as last resort).

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

158.     The report indicated that the restraint employed by Defendants Bunnell and Piette "is dangerous and out of control. Staff are seen kneeling on [T.F.'s] back, the position of her arms and wrists, twisted and lifted behind her back appear inconsistent between the staff person on her left vs. her right side. Finally, dragging her by her feet, causing injury (multiple rug burns) is not in accordance with Woodside's restraint training)."

159.     Despite RLSIU's multiple findings that Woodside was mistreating children detained at that facility, DCF took no concrete steps to require Woodside "to come into full compliance [with Vermont's Residential Treatment Program Regulations]" and end the inappropriate use of physical restraints, the use of Defendant Simons' pain compliance techniques, or the inappropriate use of solitary confinement.

160.     In fact, in response to RLSIU's detailed investigative reports, Defendants Schatz and Shea refused to acknowledge that physical or emotional abuse of Woodside detainees was an on-going problem at that facility.

161.     In a letter dated November 16, 2018, Defendants Schatz and Shea made the following commitments:

- "Retaliation is not acceptable and we do not believe that it is a pervasive issue at Woodside."
- "Trauma informed de-escalation strategies are an important component to the program that hopefully will result in very few to zero incidents of restraint and seclusion. Woodside is examining and re-evaluating its current de-escalation strategies as part of the review of restraint modality at Woodside."
- "The use of emergency safety interventions is an area that Woodside is committed to continuously improve."
- "With respect to concerns regarding Woodside's use of the North Unit, we do not have any specific corrective actions with respect to these observations until we decide the future of Woodside and its role in the system of care."

162.     Defendants Schatz and Shea then described why they disagreed with "a number of individual findings and conclusions drawn from [RLSIU's detailed] reports."

163.     Defendants Schatz and Shea did not specifically identify what findings they disagreed with but instead claimed that the unspecified findings resulted from a number of factors, including "[i]nappropriate acceptance of allegations," "lack of details and input from all individuals involved," and "lack of understanding or analysis related to the traumatic impact *staff* experience from these situations." (emphasis added).

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

164.     As a result of Defendants Schatz's and Shea's failure to fulfill their statutory and constitutional obligations to protect the safety and welfare of Woodside detainees seriously, the abuse of those children continued unabated.

165.     Nothing demonstrates Defendant Schatz's, Shea's, Gooley's, and Simons' deliberate indifference for the constitutional rights of juveniles detained at Woodside more than a video recording of the shocking and inhumane treatment of G.W. in July 2019.

166.     "This video was shot from the corridor outside a cell. It shows a horrific incident involving a teenage girl about 16 years old. The girl is completely naked. The girl is streaked with excrement. She is agitated and has moments of angry accusation followed by wild laughter. She is obviously in the middle of an acute mental crisis. In the course of the video, she is moved a few feet from a cell or anteroom into a white tiled space. The staff who moved her are dressed in "haz-mat" suits and hoods. They are all men except for a woman who can be heard in the background. They push a concave plastic shield against the girl's body and push her from the anteroom into the tile space where the door is locked. A female staff member can then be heard talking to the girl, who is occupied in pushing a wire into her right forearm. The girl is asked why she is doing that. No one interrupts this action on the video. The treatment of this girl is entirely inappropriate and demonstrates within a few minutes Woodside's limited ability to care for a child who is experiencing symptoms of mental illness." *Disability Rights v. State of Vermont*, 19-cv-106, Doc. 34, p. 11.

167.     An EMT who responded to a call from Woodside to check G.W. for a possible concussion called DCF's child abuse hotline and reported that G.W. was naked, covered in feces, urine, and menstural blood, and was nearing hypothermia.

**CONDITIONS OF CONFINEMENT**
**NATCHEZ TRACE JUVENILE ACADEMY**

168.     In a letter dated May 21, 2015, the West Virginia Department of Health and Human Resources notified Tom Hennessey, CEO of Natchez Trace Youth Academy, that the state had decided to suspend placement of West Virginia children at that facility.

169.     An investigation undertaken by the West Virginia Department of Education indicated that the facility was loud and chaotic; the facility's direct care staff was unprofessional; teachers were unprepared during instruction; West Virginia's students did not feel safe at the facility; staff would take students away from the view of cameras and beat them up; and cottages where students lived were dirty and in poor condition.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

19

170.     Vermont children placed by DCF at Natchez Trace reported similar problems at that facility.

171.     In July 2017, the Office of the Juvenile Defender informed Defendant Erin Longchamp that D.H. was subjected to an off-camera restraint during which a staff member kicked him in the testicles, and **that** D.H. was repeatedly threatened with physical harm.

172.     In one instance, a staff member warned D.H that "if you move, I'll break your neck."

173.     D.H. reported that the place was filthy and was only cleaned up when DCF staffers made scheduled visits to the facility.

174.     In September 2017, the Office of the Juvenile Defender contacted Defendant Melanie D'Amico, DCF's Residential Services Manager, and explained in detail the conditions at Natchez Trace and the abuse of D.H. at that facility.

175.     Defendant D'Amico responded by telling the Office of the Juvenile Defender that she was "worried that these overgeneralization [sic] you are making are not helpful and undermine the good work the Natchez Trace program is and has done. Only positive experiences have been reported to me."

176.     On or about 2017, the mother of a child placed at Natchez Trace by DCF reported the abuse of her child at that facility to Defendants Schatz, Wolcott, and D'Amico.

177.     The mother apparently reported that a staff member at that facility was "choking kids out" and that her child had been subjected to physical abuse and suffered injuries at the hands of staff members.

178.     The mother reported this abuse to DCF, but DCF staff members did not believe the complaints.

179.     On June 12, 2018, an attorney from the Office of the Juvenile Defender met with Defendants Gooley, and D'Amico, along with others, to discuss the out-of-state placement of children in DCF custody.

180.     During the meeting, the practices of a for-profit company called Universal Health Services (UHS) were discussed.

181.     UHS owned and operated Natchez Trace Youth Academy.

182.     Defendants Gooley and D'Amico were informed that children sent to a UHS facility were expressing their concerns to their attorney at the Office of the Juvenile Defender about the "quality of care" they were receiving at that facility.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

183.     According to the attorney from the Office of the Juvenile Defender, out-of-state programs were blocking access to her clients sent to these facilities.

184.     Defendants Gooley and D'Amico were informed that "[i]f the concern comes from the youth, there is a tendency to dismiss the credibility of the youth. There is concern that DCF is not the appropriate entity to address concerns as DCF is biased given the need for placement."

185.     DCF officials, including Defendants Schatz, Wolcott, Dale, Longchamp, Gooley, Harriman, and D'Amico, apparently did not take these complaints seriously and instead continued to place children in its custody, including R.H., at Natchez Trace Juvenile Academy.

## THE EFFECTS OF SOLITARY CONFINEMENT ON JUVENILES

186.     Stuart Grassian, M.D. is a board-certified psychiatrist who has studied the effects of solitary confinement on juveniles. Dr. Grassian's observations and conclusions generally regarding this population and the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, including *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal., 1995), affirmed sub. nom. *Brown v. Plata*, 131 S. Ct. 1910 (2011), *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), and in opinions by Justices Kennedy, Sotomayor, and Brennan in the United States Supreme Court.

187.     In a report prepared for Plaintiffs' counsel in this case, Dr. Grassian made the following observations:

188.     Solitary confinement of juveniles causes far greater harm in juveniles than in adults, and the risks of solitary confinement to juveniles are alarming. Research on adolescent development makes clear why juvenile solitary confinement is uniquely harmful.

189.     New technologies in brain research have allowed us to recognize and observe brain plasticity, that brain function and neural connectedness are still evolving and developing during adolescence, especially so in regard to the functioning of the prefrontal cortex – that part of the brain most centrally involved in inhibiting emotional reactivity, allowing mastery over the emotional reactivity of the subcortical amygdala and nucleus accumbens - the brain's more primitive emotional centers.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

190.    Brain research, both human and animal studies, has amassed a clear picture of this process[5] and there is clear evidence that this process of brain development can be derailed by stress.

191.    The effects of stress on adolescent brain development has been described in detail,[6] and there is by now a substantial body of research describing the severe lasting effects of stress on the human brain, and the particular vulnerability of juveniles to such effects.[7]

192.    There has also been a large body of research using animal models,[8] demonstrating long-term consequences of chronic unpredictable stress.

193.    The research has demonstrated that the brain's reaction to stress, the surge of cortisol (the stress hormone) modulated through the brain's hypothalamic-pituitary-axis, is massively affected in adolescents who have experienced chronic stress.

194.    Research further demonstrates that acute stress impairs the juvenile's ability to maintain goal-directed, as opposed to emotion-driven, behavior.[9] Functional brain studies have provided evidence that while adults are able to engage prefrontal cortical mechanisms to inhibit behavior that is likely to have adverse consequences, adolescents are unable to do so.[10]    These consequences – including actual morphological changes in brain structure – have been demonstrated to persist into adulthood.[11]

---

[5] *See, e.g.:* Casey, B.J., Jones, R.M., and Hare, T.A., (2008) *The Adolescent Brain,* Ann. N.Y. Acad. Sci. 1124: 111-126; Ernst, M., Mueller, S.C. (2008)  *The adolescent brain: Insight from functional neuroimaging research.*   Dev. Neurobiol 68(6) 729-743.

[6] *See, e.g.:* Tottenham, N., Galvan, A. (2016) *Stress and the adolescent brain. Amygdala-prefrontal cortex circuitry and ventral striatum as developmental targets.* Neuroscience and Biobehavioral Reviews 70:217-227.

[7] For a detailed discussion and bibliography, see, e.g. Bremner,J. (2006) *Traumatic Stress: effects on the brain.* Dialogues in Clinical Neuroscience; Vol. 8, No. 4, 445-461

[8] The harm caused animals by experimentation involving social isolation has in fact led to restrictions of such experimentation by academic review boards.  For example, Columbia University has passed rules severely restricting the housing of experimental animals alone in cages.

[9] *See, e.g.:* Plessow, F. et.al. (2012) *The stressed prefrontal cortex and goal-directed behaviour; acute psychosocial stress impairs the flexible implementation of task goals.* Exp Brain Res 216:397-408.

[10] Uy, J., Galvan, A. (2016) *Acute stress increases risky behavior and dampens prefrontal activation among adolescent boys.*  J. Neuroimage, http??dx.doi.org/10.1016/j.neuroimge.2016.08.067

[11] *See, e.g.* Hollis, F. et.al. (2012) *The Consequences of adolescent chronic exposure to unpredictable stress exposure on brain and behavior.* Jl. of Neuroscience, http://dx.doi.org/10.1016/j.neuroscience.2012.09.018; Tottenham, N, Galvan, A. (2016).

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

195.     The very act of placing a juvenile in isolation – the utter helplessness of it – is enormously stressful. This surge of cortisol – of fear, anxiety, and agitation – will be especially severe in juveniles.

196.     The brain research has yielded very clear and consistent results: As noted in an amicus brief to the United States Supreme Court: "each key characteristic of solitary confinement – lack of physical activity, meaningful interaction with other people and the natural world, visual stimulation and touch – is by itself sufficient to change the brain and to change it dramatically."[12] As brain researchers have noted, especially in juveniles, factors like stress and depression can literally shrivel areas of the brain, including the hippocampus, the region of the brain involved in memory, spatial orientation, and the control of emotions - a burden that may well become permanent.

197.     Dr. Grassian's report has been provided to Defendants.

## SOLITARY CONFINEMENT IN THE NORTH UNIT

198.     Woodside managers had to approve the transfer of children detained at Woodside from the East and West Units to the North Unit.

199.     This usually meant that either Defendant Simons or Defendant Steward had to approve any transfer to the North Unit.

200.     In at least one instance, Defendant Cathcart, in his capacity as acting Director at Woodside approved the transfer of B.C. to the North Unit.

201.     Before becoming Director of Woodside, Defendant Simons had worked at the Ethan Allen furniture factory, served in the U.S. military, and worked for the Vermont Department of Corrections.

202.     Thus, Defendant Simons appears to have had no professional training and experience caring for juvenile detainees who suffered from serious mental illness or the effects of childhood trauma resulting from emotional, physical, and/or sexual abuse.

203.     It is unclear whether Defendant Simons was aware of research on adolescent development that makes clear why juvenile solitary confinement is uniquely harmful.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

*Stress and the adolescent brain; Amygdala-prefrontal cortex circuitry and ventral striatum as developmental targets.* Neuroscience and Behavioral Reviews, 70, 217-227.
[12] Amicus Brief to U.S. Supreme Court of Medical and Other Scientific and Health-Related Professionals filed 12/23/16 in *Ziglar v. Abbassi et.al.* and companion cases.

204.     Likewise, before becoming Woodside's clinical director, Defendant Steward appears to have had no professional training or experience caring for juvenile detainees who suffered from serious mental illness of the effects of childhood trauma.

205.     According to her resume, Defendant Steward had earned a doctoral degree in counseling psychology from SUNY Buffalo.

206.     Defendant Steward's dissertation is entitled "Art Therapy Intervention with 'At-Risk' Adolescent Boys: Effects on self-image and Perceptions of Loss."

207.     According to the dissertation, Defendant Steward's research subjects were former public school students who lived at home while attending an alternative school in a major metropolis in the Northeast.

208.     The research subjects "arrived at the alternative school at varying times depending on what school district they were coming from, what mode of transportation they were taking, and sometimes their mood."

209.     The data collected during Defendant Steward's experiment in art therapy was apparently inconclusive and she was unable to prove her original thesis.

210.     The dissertation ends with this observation: "This writer is left missing the participants, hoping for them, and committing to the challenge of trying to make art therapy a part of more children's lives.

211.     It is unclear whether Defendant Steward was aware of research on adolescent development that makes clear why juvenile solitary confinement is uniquely harmful.

212.     Anytime a detainee was transferred to solitary confinement in the North Unit and stayed for at least seven days, DCF's deputy commissioner was required to review the placement and approve any further detention in solitary confinement.

213.     In March 2018, Defendant Shea reviewed the placement of B.C. in the North Unit and approved B.C.'s further detention in solitary confinement.

214.     On another occasion, in March 2018, Defendant Shea reviewed the placement of T.W. in the North Unit and approved T.W.'s further detention in solitary confinement.

215.     At this point, it is unclear how many other children Defendant Shea committed to the North Unit for more than seven days.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

216.     Nor is it clear whether Defendant Shea had any specialized training and experience before she started committing children to further detention in solitary confinement.

217.     It is unclear whether Defendant Shea was aware of research on adolescent development that makes clear why juvenile solitary confinement is uniquely harmful.

218.     It is unclear whether Defendant Cathcart had any specialized training and experience before he started committing children to detention in solitary confinement in Woodside's North Unit.

219.     It is unclear whether Defendant Cathcart was aware of research on adolescent development that makes clear why juvenile solitary confinement is uniquely harmful.

220.     In October 2018, an attorney from the Office of the Juvenile Defender attended a Woodside Stakeholder meeting with Defendant Steward. Defendant Steward asked the attorney to provide a detailed description of what needed to be changed at Woodside.

221.     In an email dated October 24, 2018, the attorney from the Office of the Juvenile Defender informed Defendant Schatz that she had witnessed the conduct of Woodside staff members that "if perpetrated by a parent, would have likely resulted in substantiation, removal, and criminal prosecution. As a former DCF investigator, it takes a lot to shock and dismay me. I am shocked and dismayed at Woodside on a regular basis. Moreover, the lack of accountability for staff who hurt residents and perpetrate a culture of silence in the face of resident maltreatment is deeply troubling."

222.     The attorney from the Office of the Juvenile Defender told Defendant Schatz that Woodside should (1) "begin utilizing a nationally-recognized de-escalation and restraint-training protocol immediately"; (2) revise its use-of-force policy immediately; and, (3) close the North Unit.

223.     Defendant Schatz ignored all of these proposals.

224.     While he was ignoring these proposals, it is unclear whether Defendant Schatz was aware of research on adolescent development that makes clear why juvenile solitary confinement is uniquely harmful while he was overseeing the operation of the North Unit at Woodside as DCF commissioner, or took the time to find out more about this subject after problems in the North Unit were first brought to his attention.

225.     Based on his review of the documents provided to him by Plaintiffs' counsel, Dr. Grassian offered the following observations that the solitary

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

confinement experienced by juveniles at Woodside, and in particular the conditions experienced by G.W., was in no way less harsh than the solitary confinement of adults:

## Physical Setting

226.     Cell - Solitary confinement cells in adult prisons are small, generally about 90-100 square feet in size. The North Unit cells at Woodside are approximately the same.  In adult prisons, solitary confinement cells typically contain either a metal bed fixed to the floor or a concrete slab on which a mattress is placed and a stainless-steel sink and toilet combination.  This is the case in three of the four North Unit cells at Woodside; the fourth is a "dry cell" lacking a toilet, sink, or any source of fresh water.  Sometimes in adult solitary cells there is also a concrete or hard plastic stool and a small steel shelf or table fixed to the wall.  This is apparently lacking in the North Unit cells.

227.     Adult prison cells have various types of locking doors, and they also sometimes vary in the amount of visual stimulation allowed. These include barred doors, barred doors with a plexiglass wall bolted onto it, sliding steel or hinged steel doors.  Hinged steel doors tend to be the harshest, allowing very little ventilation and making conversation through the door very difficult. The videos I was shown in this case indicate that the North Unit doors were hinged doors.

228.     In the adult prison setting, there is usually a window facing the outside world, allowing some amount of visual stimulation.  Harsher settings either have no window to the outside or the window is glazed or painted over in such a way as to not allow the occupant to see through the window.  The videos I was provided seem to indicate that the North Unit cells have windows that are glazed in such a fashion as to render them translucent but not transparent.

229.     In the adult solitary confinement setting, food is generally delivered through a cuff port, and the occupant eats alone, either sitting on his bed or, if available, on a stool with a little table affixed to the wall. The cells in the North Unit appear to lack such a stool and table for eating.

230.     In adult solitary, "recreation" or "exercise" is generally an hour a day, several days a week (most typically, Monday-Friday) in either another cell or outdoors in either a concrete enclosure or in a long narrow chain link "dog run." In the latter circumstance, sometimes other inmates will be out in adjacent dog runs. The North Unit provides no outside recreation at all, only access to a relatively small, fairly barren "day room."  And the documents provided indicate that in many cases, including G.W.'s, access to the day room is only sporadic; sometimes over a week can go by with the juvenile having no opportunity at all to leave her cell.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

231.     In isolated confinement, there is generally very limited opportunity for any form of normal social interaction. Inmates sometimes invent or discover some limited way of communicating with other inmates on their tier – e.g., shouting, using the vent system as a kind of intercom system, etc. Telephone contact is quite limited. Social and family visits are limited and are almost always non-contact, often with a plexiglass window allowing visual contact and telephones required to speak with the visitor. Inmates often spend days, weeks, or even months with no social interaction other than curt interactions with correctional staff. It is my understanding that at the North Unit, children have no interaction with anyone at all from 8 p.m. until 9 a.m. the next morning, and that children could go days, weeks, or even months without contact with other children.

232.     An adult in solitary confinement will typically be allowed to have a limited amount of reading material in her cell, including books shipped directly from the publisher. The inmate may also have some other means of distracting herself – a radio, a small tv, or an mp-3 player, etc. It is my understanding that in the North Unit no such amenities are permitted, not even books, and furthermore there was no access to TV or radio.

233.     This lack of reading materials is part of an especial concern for juveniles in a detention facility. The responsibility of a juvenile detention facility is not only to provide custody and security, its mission is also centrally one of providing service to help the juvenile mature into a responsible and productive adult. Educational services are an essential part of that responsibility, and apparently there are virtually no educational services provided to juveniles confined in the North Unit – just papers passed under the cell door. No teacher meets with the student.

234.     There are other features of confinement at the North Unit that are almost unprecedented. Many commentators have described the excessive use of force widely used at the North Unit. I certainly am not naïve enough to think that Corrections Officers in adult prisons never intentionally cause inmates pain, but such abuse is limited by the fact that it is officially prohibited. On the other hand, at Woodside "pain compliance" techniques are in fact taught and authorized. There are videos showing G.W. screaming as her arms are being hyperextended over her head. Several observers have commented that Woodside staff lack mental health training and, instead of finding ways to deescalate the situation with an emotionally troubled juvenile, they resort to force and intimidation.

235.     In addition, at times G.W. was left naked for long periods of time in her cell in the North Unit, her clothes having been pulled off her by several male staff converging on her and holding her down. This is especially concerning as G.W. is reported to have been raped some months before she was forcibly stripped by several male staff and then left naked in her cell.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

## FACTUAL BACKGROUND
## D.H.

236.     After D.H. was placed into the custody of DCF, D.H. was detained at Woodside, was subjected to solitary confinement in the North Unit, and was sent out-of-state to Natchez Trace Youth Academy where he was physically abused on a regular basis.

237.     After DCF transferred D.H. to Natchez Trace Youth Academy, one Natchez Trace staff member threatened that he would "snap [D.H.'s] neck." Another staff member tackled him, while another kicked him "in [his] balls."

238.     While detained at Natchez Trace Youth Academy, D.H. brought the inhumane conditions at that facility to the attention of Defendant Dale.

239.     D.H. told Defendant Dale that Natchez Trace "was a bad place, staff hit a kid's face off the wall and his nose started to bleed."

240.     D.H.'s reports of the inhumane conditions at the Natchez Trace facility were ignored by Defendant Dale.

241.     In July 2017, the Office of the Juvenile Defender reported the abuse of D.H. at Natchez Trace to Defendant Longchamp.

242.     DCF did not respond to the Juvenile Defender's report of the inhumane conditions at the Natchez Trace facility and the abuse of D.H.

243.     In September 2017, the Office of the Juvenile Defender reported the abuse of D.H. at Natchez Trace to Defendant D'Amico.
244.     The Juvenile Defender's email reporting this abuse to Defendant D'Amico included a link to the letter sent to the CEO of Natchez Trace by the West Virginia Department of Health and Human Resources in May 2015.

245.     The Juvenile Defender's report of the inhumane conditions at the Natchez Trace facility and the abuse of D.H. was ignored apparently by Defendant D'Amico.

246.     On December 17, 2017, an attorney with the Office of the Juvenile Defender filed a grievance on behalf of D.H.

247.     The grievance alleged improper placement of D.H. into solitary confinement in the North Unit.

248.     In addition, the grievance indicates that the attorney from the Office of the Juvenile Defender asked Defendant Steward to reconsider her order sending D.H.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

into solitary confinement because "it was not in line with applicable policy" and that Steward denied the request.

249.     The grievance requested a prompt review of Defendant Simons' and Steward's decision to send D.H. into solitary confinement in the North Unit and immediate release from the North Unit.

250.     In a memo dated December 18, 2017, Defendant Simons denied the grievance.

251.     In December 2017, while D.H. engaged in disruptive and annoying behavior at Woodside, Defendant Dubuc sent an email notifying staff that "after discussion at the Clinical Team it was decided that DH would benefit from increased support and lower stimulation" in one of the North Unit's isolation cells.

252.     The decision to commit D.H. to solitary confinement in one of Woodside's isolation cells violated North Unit's procedure requiring Woodside detainees to demonstrate actual harm or imminent risk of harm to self or others before they could be isolated in the North Unit.

253.     When asked about the decision to send D.H. into solitary confinement, Defendants Simons, Cathcart, and Steward gave contradictory explanations, neither of which were based on North Unit's policy that only those who demonstrated actual harm or imminent risk if harm to self or others could be placed in a North Unit isolation cell.

254.     At this point, it is impossible to catalogue every instance of the abuse D.H. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of D.H.'s DCF file and the video recordings of Woodside staff interactions with him.

## FACTUAL BACKGROUND
## R.H.

255.     Between April 2010 and December 2018, the Vermont Department for Families and Children (DCF) had custody of R.H. While he was in the custody of DCF, R.H. experienced at least forty different placement transitions, ending with his detention at DCF's Woodside Juvenile Detention Center.

256.     Numerous evaluations confirm that R.H. had suffered from repeated physical, mental, and sexual abuse as a child and, as a result of his history of trauma and abuse, he suffered from a number of psychiatric conditions, including post-traumatic stress syndrome, that contributed to his challenging behaviors and internal emotional distress.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

257.     Between March 2018 and December 2018, R.H. was detained at DCF's Woodside Juvenile Detention Center.

258.     Between March 2018 and December 2018, R.H. spent at least 67 days in solitary confinement in Woodside's North Unit.

259.     While R.H. was being held in solitary confinement in Woodside's North Unit, Woodside staff turned off the water to R.H.'s locked cell, and he was unable to flush his toilet or get a drink of water.

260.     At times, R.H. was not provided with a mattress or books to read.

261.     In April 2018, Defendant Simons and Defendant Steward decided to take everything out of R.H.'s isolation cell, including his mattress, blanket, and reading material, and told R.H. he could "earn it back."

262.     On April 18, 2018, Woodside staff restrained R.H. in an effort to effectuate the plan. When R.H. resisted, Woodside staff, led by Defendant Dubuc, entered R.H.'s isolation cell equipped with a riot shield, restrained him face down on his bed, and cut off R.H.'s clothing. R.H. spent the remainder of the night dressed only in his shorts.

263.     Following the April 18, 2018 incident, R.H. reported that he experienced the forcible removal of his clothing as "like a sexual assault," something that he had, in fact, experienced as a child.

264.     While held in solitary confinement in his North Unit seclusion cell, R.H. was deprived of educational services required by his Individualized Education Plan.

265.     Defendant Steward approved the orders sending R.H. into solitary confinement.

266.     Between March 2018 and December 2018, R.H. was physically restrained about ten times during which Woodside staff, including Defendants Hatin, Weiner, Martinez, and Rochon, employed the pain compliance techniques developed by Defendant Simons.

267.     Defendant Steward signed the orders authorizing the physical restraint of R.H.

268.     Several weeks later, Defendant Steward watched Woodside staff members hurting R.H. and did not intervene or take other steps to protect R.H.

269.     Instead, Defendant Steward threatened R.H., telling him that Woodside staff would take away his clothes again if he did not comply with her plan.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

270.    On July 6, 2018, an attorney for R.H. filed a Motion for an Emergency Protective Order in the Vermont Family Court alleging that Woodside staff improperly restrained him and transferred him to solitary confinement in the North Unit.

271.    According to the motion, on April 17, 2018, while he was secluded in the North Unit, Defendants Simons, Cathcart, and Martinez entered R.H.'s cell, restrained him on the bed, and stripped the cell of all of R.H.'s belongings, including his bedding.

272.    The following day, Defendants Dubuc, Martinez, Rochon, and Weiner entered R.H.'s seclusion cell, restrained him, pinned him face-down on his bed, and used a cutting tool to remove R.H.'s shirt.

273.    On May 4, 2018, several male staff members surrounded R.H. and restrained him and then escorted his to a seclusion cell in the North Unit. While R.H. was pinned to the ground, Defendant Steward told R.H. that staff would take away his clothes again if he could not be safe with them.

274.    During the May 4, 2018 restraint, R.H. alleged that Defendant Weiner "intentionally dug his finger into a pressure point on [R.H.'s] jaw and applied pressure to [R.H's] neck in order to cause him pain. The video shows [R.H.] yelling that Mr. Weiner is 'choking' him, but Mr. Weiner's hands are hidden from view of the camera."

275.    According to the motion, between June 17, 2018 until July 5, 2018, R.H. was secluded in a North Unit cell almost continuously.

276.    On July 18, 2018, R.H.'s attorney filed a Second Motion for a Protective Order.

277.    This motion indicated that R.H.'s attorney had tried to resolve issues related to her client's mistreatment at Woodside, to no avail.

278.    R.H.'s attorney informed Defendants Simons and Gooley that Woodside staff members had forcibly removed R.H.'s clothing, deliberately injured him, and had unlawfully secluded him.

279.    In response to these complaints, Defendants Simons justified this conduct, claiming that R.H. had consented "to having his shirt cut off while being pinned face-down down on a hard [floor] by [Defendant Dubuc and others] who were literally twisting both of his arms at the time per [R.H.'s] report and video evidence."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

280.     It is unclear whether Defendant Simons or Defendant Gooley ever responded to R.H.'s grievances.

281.     Counsel then asked Defendants Simons and Cathcart to "pair" R.H. with staff members who were less violent. That request was ignored by Defendants Simons and Cathcart. Instead, R.H. continued to be paired with Defendant Weiner, who had assaulted him earlier in the month.

282.     By refusing to help R.H., Defendants Simons and Cathcart violated their constitutional duty to protect R.H. from harm.

283.     On June 29, 2018, R.H. met with counsel and requested a book to help him pass time while he was held in solitary confinement.

284.     Counsel met with Defendant Steward and conveyed R.H.'s request. Overhearing this conversation, Defendant Bunnell stated R.H. might get the book he requested "if and when it was determined to be clinically indicated."

285.     On July 3, 2018, Defendant Steward refused to allow R.H.'s expert witness, Paul Capcara, R.N., to meet with R.H.. Defendant Steward also refused to allow counsel to meet with her client.

286.     That day, R.H. told Defendant Steward that he wanted to speak with his lawyer.

287.     On July 13, 2018, Defendant Steward met R.H. in the North Unit and tried to ask him questions about the complaint his attorney filed in the Vermont Superior Court on July 6, 2018.

288.     During this meeting, Defendant Steward informed R.H. that he had no chance of winning or getting moved to a different placement because he was already in a "long-term" program at Woodside.

289.     R.H. believed that Defendant Steward was pressuring him to tell his attorney to dismiss the Complaint, and that if he did, he would get more privileges.

290.     On July 20, 2018, R.H. was scheduled to meet with two investigators about an assault on another Woodside detainee that R.H. had witnessed.

291.     After R.H. refused to meet with the investigators, Defendant Steward praised R.H. for making a "good choice."

292.     On August 3, 2018, R.H. met with an investigator but refused to talk. R.H. told the investigator that he was afraid that if he talked, Defendant Steward would retaliate against him.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

293.    In late July or early August 2018, Defendant Steward told R.H. not to authorize his lawyer to receive copies of R.H.'s clinical notes at Woodside.

294.    In a second meeting, Defendant Steward promised to give R.H. "blue status," i.e., additional privileges, if he did not authorize the release of his clinical records to his attorney.

295.    At the time, the discovery of these records was an issue in R.H.'s Vermont Superior Court case, with the Vermont Attorney General's Office informing R.H.'s attorney that DCF "opposes the release of clinical records."

296.    Throughout August and September 2018, Defendants Simons and Steward pressured R.H. to dismiss his Vermont Superior Court case.

297.    In September 2018, they urged R.H. to write a letter to his attorney and tell her he wanted the case dismissed.

298.    Succumbing to this pressure, and believing he had no chance of prevailing, R.H. wrote the letter and his case was dismissed.

299.    During the four-month period between mid-March 2018 and mid-July 2018, R.H. spent 67 days in solitary confinement in the North Unit and was subjected to an excessive number of involuntary interventions, including 47 instances of seclusion and 6 instances of restraint.

300.    A number of these incidents was investigated by the Office of Residential Licensing and Special Investigations (RLSI).

301.    The RLSI investigators interviewed witnesses and reviewed video recording of the incident.

302.    The RLSI investigative report indicates that Defendants Dubuc, Martinez, and Weiner restrained R.H.. According to the report, R.H. indicated that Defendant Weiner grabbed R.H. by the neck and that R.H. was unable to breath.

303.    The RLSI report indicates that on one occasion, Defendants Martinez, Dubuc, and Weiner, all dressed in riot gear, went into R.H.'s room and pinned his face to the floor, with his arms extended backwards.

304.    At one point during the investigation, RLSI investigators told Defendant Simon that the routine use of the North Unit to isolate Woodside detainees violated RTP regulations. Defendant Simons responded "We violate that."

305.    The investigators also reported that R.H. alleged that Defendant Steward interfered with his right to meet with his lawyer and the investigators believed that R.H. demonstrated real fear of retaliation for naming concerned staff members or addressing the restraints as using pain compliance."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

306.     Based on their investigation into R.H.'s complaints, RLSI investigators concluded that Woodside violated Regulations 201 (right to humane treatment and right to be free from excessive use of restraint and isolation); 648 (prohibition of pain inducement techniques and hyperextension of joints); 650 (prohibition of restraint modality that is not approved by licensing agency); 651 (restraint shall only be used as last resort); 654 (restraint shall never be used for coercion, retaliation, humiliation, as a threat of punishment or form of discipline, in lieu of adequate staffing, for staff convenience, or for property damage not involving imminent danger); 660 (children in seclusion must be provided with uninterrupted supervision by qualified staff); 701 (A RTP shall be equipped to provide physical comfort of all children); and, 718 (No youth's bedroom shall be stripped of its contents and used for seclusion).

307.     In addition to being abused at Woodside, R.H. was placed at several out-of-state juvenile detention centers, including Natchez Trace Youth Academy in Tennessee after credible complaints about the treatment of children held at that facility had been made to Defendants Schatz, Shea, Gooley, Wolcott, Dale, and Longchamp.

308.     While detained at Natchez Trace Youth Academy, R.H. was physically abused by staff members employed by that facility on a regular basis.

309.     R.H.'s complaints to Defendant Amelia Harriman regarding this abuse were ignored and never seriously investigated.

310.     At this point, it is impossible to catalogue every instance of the abuse R.H. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of R.H.'s DCF file and the video recordings of Woodside staff interactions with him.

## FACTUAL BACKGROUND
## T.W.

311.     In 2018, Plaintiff T.W. was detained at the Woodside Juvenile Rehabilitation Center ("Woodside") in Essex, Vermont.

312.     While T.W. was being detained at Woodside, Plaintiff was repeatedly and unlawfully placed in a seclusion cell in the so-called "North Unit," and repeatedly and unlawfully subjected to painful physical restraints.

313.     The unlawful isolation of T.W. in the North Unit seclusion cell and painful physical restraints is detailed in Woodside Orders for Restraint/Seclusion dated February 11, 2018; February 13, 2018; February 27, 2018; March 5, 2018; March 7, 2018; April 8, 2018; May 4, 2018; May 6, 2018; May 24, 2018; and May 25, 2018.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E - PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

314.    According to these incident reports, Defendants Simons and Steward issued these unlawful orders, following requests from Defendants Cathcart Hamlin, Bunnell, Dubuc, and Scrubb.

315.    According to these incident reports, Defendants Bunnell, Cathcart, Martinez, Weiner, Piette, Rochon, Hamlin, Ruggles, Hatin, Schrubb, and Dubuc requested and/or received and carried out the orders to unlawfully place T.W. in a North Unit isolation cell or physically restrain her, or witnessed this unlawful conduct without fulfilling their constitutional obligation to intervene or take other steps to protect T.W.

316.    On May 29, 2018, the Office of the Juvenile Defender filed a Motion for a Protective Order requesting a court order requiring Defendant Schatz and his agents working at Woodside to stop using dangerous restraint techniques designed to induce pain.

317.    RSLIU conducted an investigation into the use of the dangerous restraint techniques used on T.W. and her placement in the North Unit's isolation cells alleged in the Motion for a Protective Order.

318.    Specifically, RSLIU investigated the restraints employed on May 6, 2018, May 24, 2018, May 26, 2018, and June 11, 2018.

319.    The Woodside Incident Report for the May 6, 2018 restraint has been provided to Defendants.

320.    The Woodside Incident Report for the May 24, 2018 restraint has been provided to Defendants.

321.    Photos of injuries suffered by T.W. while she was detained at Woodside have been provided to Defendants.

322.    On June 11, 2018, a hearing was held in the Vermont Superior Court related to the Motion for a Protective Order filed by T.W.'s attorney on May 29, 2018.

323.    During the hearing, T.W. testified that on May 24, 2018, Defendants Simons and Bunnell twisted her arms and that she heard a "pop in her arm when they were twisting it." T.W. rated the pain level related to the multiple arm twists as "8 out of 10" and "9 out of 10."

324.    After T.W. returned to Woodside after the June 11, 2018 hearing, T.W. was subjected to another painful physical restraint during which she was taken down to the floor, with a staff member's knee in her back.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

325.     During the restraint, a video reveals that T.W. begins to scream "you're breaking my arm" as an unidentified staff member puts her arm in a "position [that] looks visibly painful."

326.     The RLSIU investigator who viewed the video indicated that it was "extremely concerning ... [T.W.] is clearly in pain throughout the restraint which leads this writer to believe the restraint techniques used at Woodside are utilizing pain compliance. Given that [T.W.] is on her stomach, at points with someone's knee in her back, there are serious safety risks for injury and difficulty breathing."

327.     The RSLIU report concludes with this analysis: "The first major theme of the grievances pertains to the use of restraints and the modality used. The restraint modality is not evidence-based nor a nationally recognized modality. Given [T.W.'s] pain ratings, the video evidence, the testimony of Mr. Capcara and [T.W.] herself, this restraint modality uses pain compliance. The hyperextension of joints, the crossing of the legs, the prone position, are all indicative of a law enforcement restraint model. The restraint documentation also demonstrates that Woodside is not using restraint only as a last resort. Many times, [T.W.'s] state of refusal or the disruption of other residents were reasons for the restraint. This does not show that [T.W.] or any other residents were in imminent danger. Additionally, Woodside staff do not give space to residents, but close in on them, escalating their behavior thereby creating a need for restraint. This is not a trauma-informed approach and is clearly not an effective intervention or an appropriate de-escalation plan, given [T.W.'s] trauma history."

328.     On May 26, 2018. Defendants Dubuc, Cathcart, and Rochon restrained T.W. and "escorted" her to her room.

329.     RLSIU investigators reviewed a video of this incident and concluded that Woodside staff members engage in conduct that only leads to escalation.

330.     According to those investigators, "this is an identified theme in some of the restraint and incident reports reviewed by [an RLSIU investigator]. Woodside staff do not give space to residents but close in on them, almost escalating them into needing a restraint. This is not a trauma-informed approach and does not seem to be effective intervention or an appropriate de-escalation plan, given [T.W.'s] trauma history."

331.     During this restraint, Defendant Dubuc pushed his fingers into T.W.'s left eye orbital socket, leaving a 50-cent size bruise on T.W.'s face.

332.     RSLIU's investigative report concluded that Woodside's (a) use of a restraint modality that uses pain compliance that can result in hyperextended joints on Plaintiff; and (b) use of the North Unit's isolation cells to seclude Plaintiff violated Regulations 201 (right to humane treatment and right to be free from excessive use of restraint and isolation); 648 (prohibition of pain inducement

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

techniques and hyperextension of joints); 650 (prohibition of restraint modality that is not approved by licensing agency); 651 (restraint shall only be used as last resort); and 660 (children in seclusion must be provided with uninterrupted supervision by qualified staff).

333.     RSLIU's report concluded that the "Governing Authority must provide RSLI a plan to address the identified areas of Non-Compliance and areas of Compliance, but with Reservations, with the intent to come into full compliance by November 16, 2018."

334.     At this point, it is impossible to catalogue every instance of the abuse T.W. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of T.W.'s DCF file and the video recordings of Woodside staff interactions with her.

## **FACTUAL BACKGROUND**
## **G.W.**

335.     G.W. was detained at Woodside and subjected to painful physical restraints and solitary confinement in 2016 and 2019.

336.     In 2016, G.W. was detained at Woodside for about five weeks in May and June and for about three months between September and December.

337.     Between September and December 2016, G.W. was detained in a North Unit isolation cell where she was physically restrained at least 31 times.

338.     Defendants Steward gave many of the orders to restrain and seclude G.W. after receiving requests from, among others, Defendants Hatin and Bunnell.

339.     According to incident reports, Defendants Simons, Hamlin, Rochon, Ruggles, Dubuc, Brice, Bunnell, Scrubb, Piette, Weiner, and Martinez either participated in, or witnessed these unlawful physical restraints.

340.     By ordering or participating in these restraints, or by failing to intervene to protect G.W. during these restraints, Defendants Steward, Simons, Hamlin, Rochon, Ruggles, Dubuc, Brice, Bunnell, Scrubb, Piette, Weiner, and Martinez failed to fulfill their constitutional obligation to protect G.W. from harm.

341.     In addition, on November 17, 2016, Defendant Bunnell notified Defendant Dale that G.W. was subjected to solitary confinement in the North Unit.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

342.     After receiving this message, Defendant Dale did not intervene or take any other steps to protect G.W. from this abuse, and thus failed to fulfill his constitutional obligation to protect G.W. from harm.

343.     On occasion, G.W. had no clothes and was only provided with a blanket. At times, she was left naked in her isolation cell without clothes or a blanket.

344.     In October 2016, the Office of the Juvenile Defender sent Defendant Dale an email complaining about the treatment of G.W. at Woodside, explaining that G.W. "seems to be getting worse at Woodside and on ISU, not better. [G.W.] appears to be more depressed every time I see her, and she has no hope that things will improve. Without hope, what incentive to [sic] [G.W.] have to do anything? Furthermore, there seem [sic] to be some significant mental health needs that remain unmet."

345.     Defendant Dale forwarded the Juvenile Defender's email to Defendants Simons and Steward.

346.     On December 2, 2016, an attorney from the Office of the Juvenile Defender met with Defendants Simons and Shea and explained to them in great detail how G.W., who was 13 years old at the time, was being mistreated at Woodside.

347.     The attorney from the Office of the Juvenile Defender told Defendants Simons and Shea that G.W. had gained so much weight while being held in solitary confinement in the North Unit that stretch marks could be seen on her skin.

348.     G.W.'s basic needs, including exercise and personal hygiene, were ignored. Because the water was shut off in the cell, the toilet went unflushed and the room smelled so bad that visitors had to mask the odor with Vick's VapoRub.

349.     Defendants Simons and Shea dismissed these complaints and did nothing to improve G.W.'s conditions of confinement. By doing so, Defendants Simons and Shea violated their constitution duty to protect G.W. from harm.

350.     In May 2019, after stealing a car and crashing it during a police chase, G.W. was again detained at Woodside.

351.     Before her release in July 2019, G.W. was subjected to solitary confinement in a North Unit isolation cell.

352.     Defendant Simons signed G.W.'s seclusion orders on June 4, 2019 and June 18, 2018.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

353.     In addition, G.W. was subjected to repeated physical restraints throughout the month of June 2018.

354.     A series of videos depict the conditions of her nightmarish confinement in the North Unit.

355.     On June 4, 2019, Defendants Simons, Cathcart, Bunnell, and others are seen on a video recording entering G.W.'s isolation cell to put a smock on her.

356.     In the video, Defendant Bunnell is wearing the green jacket. Weiner is wearing the green tee-shirt. Defendant Cathcart is the one wearing glasses with a checked shirt. Defendant Simon has a beard and is wearing a checked shirt. Simons tells G.W. to "take it off."

357.     After the men enter G.W.'s isolation cell, G.W. says in a loud voice that she is not doing anything wrong. Defendant Simons yells "Down, down." Defendant Bunnell and another male staff member hold G.W. face-down on the bed platform. As a male staff member uses metal bars to hold G.W.'s legs in place, Bunnell and Weiner hold G.W.'s arms behind her back and up toward the ceiling. Defendant Cathcart watches as this happens, holding a smock in his hands.

358.     As G.W. screams "stop, don't do this," and with Defendants Simons and Weiner holding her arms up and behind her back, Defendants Bunnell and another male staff member forcibly remove her clothes.  As this is happening, G.W. sounds like she is vomiting. As Simons tells G.W. she is "fine," G.W. tells the men to let go of her. Bunnell then forcibly removes G.W.'s shirt and gives it to a male staff member who throws it out of the cell. G.W. continues to scream and says that she is unable to breath. Simons and the others then quickly leave, locking the cell door once they are all out.

359.     On June 4, 2019, Defendants Simon, Cathcart, and Bunnell, along with several other staff members, surround G.W. who is on the floor at the top of a stairway.

360.     The video shows that G.W. is dressed in a tee-shirt. Bunnell is wearing a green jacket. Simons has a light checked shirt on, Cathcart is wearing the dark checked shirt.

361.     As G.W. screams, Bunnell turns G.W. over, and while she is face-down, Bunnell pulls her lower legs up, crosses them, and leans into her legs. G.W. screams "my knee, ow, my knee."

362.     By grabbing her arms that are still behind her back, Defendants Simons and Bunnell then lifts G.W. up from the floor. As G.W. continues to scream, Simons, Cathcart, and Bunnell then carry G.W. down the stairway.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E - PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

363.     When they get G.W. to the bottom of the stairs, Defendants Simons and Cathcart place handcuffs on G.W.'s wrists while her arms are still held high behind her back, as Bunnell holds her legs down.

364.     Defendants Simons, Bunnell, and Cathcart then pick G.W. up by her arms and legs and carry her down the hall as she screams "my neck" and "no."

365.     After arriving at a cell, Defendants Simons, Bunnell, and Cathcart lower her to the floor and drag her into it by her arms which are still cuffed and behind her back.

366.     Defendant Simons then puts his knee into G.W.'s back and asks Cathcart to uncuff her as she screams in pain. Bunnell can be seen kneeling on G.W.'s legs as the cuffs are taken off.

367.     A female staff member then searches G.W. and finds a small screw in her bra.

368.     On June 18, 2018, Defendants Cathcart, Weiner, and several other male staff members enter G.W.'s cell, bringing with them a riot shield.

369.     As G.W. lies on her bed, Defendant Weiner and one of the male staff members presses the riot shield onto her chest and face.

370.     Defendant Cathcart instructs the men to roll G.W. over so that they can remove her blanket and smock.

371.     G.W. yells "there's no females" as she lies on the floor with the shield pressed up against her face.

372.     As G.W. lies face-down on the floor with Weiner holding her arm up behind her back, Defendant Cathcart removes the smock, as G.W. screams "stop, stop, stop."

373.     Once the smock has been removed, Cathcart, Weiner, and the others retreat, leaving G.W. lying naked on the cell floor.

374.     On June 20, 2019, G.W.'s attorney filed the Verified Motion for a Protective Order in the Vermont Superior Court, Chittenden Family Division that alleged that G.W. was being abused at Woodside.

375.     On June 24, 2019, the Vermont Superior Court held an evidentiary hearing on the motion for a protective order.

376.     During the hearing, G.W.'s expert, Dr. Christopher Bellinci testified that "Woodside had placed [G.W.] at risk of physical and psychological harm by

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

repeatedly restraining her on the floor and stripping her naked, subjecting her to dangerous and painful restraint techniques, and involuntarily escorting her down a flight of stairs. Dr. Bellonci explained that the involuntary removal of clothing and forced nudity are particularly damaging to someone [like G.W.] who has been a victim of sexual assault."

377.    A video from June 27, 2019 shows Defendants Simons, Cathcart, Hamlin, Rochon, Dubuc, and other staff members confronting G.W. who is standing naked by her cell door, covered in feces.

378.    A federal court described what it saw on this video as a "horrific incident" involving Woodside staff members doing nothing as G.W. sits in her isolation cell, naked and covered in feces, as she inserts a wire into her arm.

379.    On June 28, 2019, G.W.'s attorney filed a Verified Motion for an Ex Parte Protective Order in the Vermont Superior Court, Chittenden Family Division, asking the court to issue an order "restraining the Commissioner of the Department for Children and Families and his agents continuing to confine [G.W.] at Woodside and order the Commissioner and his agents to transfer [G.W.] to a hospital immediately."

380.    The motion refers to an incident on June 26, 2019 during which G.W.'s safety smock, along with her blanket, were forcibly removed by Woodside staff members and that Defendants Simons and Cathcart "grappled with [G.W.] while she was naked and forced her back into her room." Shortly thereafter, Simons and Cathcart put their hands on G.W., who was naked, and " 'escorted' her involuntarily to her room."

381.    On June 28, 2019, Defendants Dubuc and Martinez, along with two unidentified men dress in Tyvek suits, entered G.W.'s cell as she was lying naked on the floor.

382.    Defendant Dubuc is wearing a blue shirt and shorts. Defendant Martinez is seen standing next to Dubuc.

383.    The two men in the Tyvex suits then drag G.W., who is face down, along the cell floor.

384.    As G.W. screams, the two men in the Tyvex suits pull G.W.'s arms behind her back, while Defendant Dubuc stands over her naked body.

385.    The men are then seen retreating from the cell, leaving a still-screaming G.W. lying naked and alone on the floor as they close the feces-smeared cell door behind them.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

386.     On June 9, 2019, the Essex Rescue squad was called to Woodside to deal with an emergency involving G.W.

387.     The Woodside Incident Report indicates that Defendants Simons, Piette, Hatin, and Rochon either participated or witnessed what happened to G.W. on June 9, 2019.

388.     Two days later, a member of the Essex Rescue squad sent an email to Defendant Simons and reported what she had witnessed:

> My name is Ashley Williams, I am an AEMT with Essex Rescue. This past Sunday, June 9 at 5:34 PM, we received a call on our non-emergency line for a 911 ambulance for a 16 year old female hitting her head against the wall. We directed the staff to call 911 and responded to the Woodside Correctional Facility. We were met outside by staff who indicated that the patient was now stating she could not move. A staff member informed me that they had been in contact with First Call that morning and had concerns that the patient was prone to self harm. He also stated that she was manipulative.
>
> When I entered her cell she was laying flat on the bed, naked except for a smock. The cell was covered with water, urine and menstrual fluid. She was soaking wet from head to toe, as was her smock. She was shivering uncontrollably and her extremities were extremely cold to the touch.
>
> We were able to take her to the hospital without incident, however upon arrival at the E.D. when the nurse from Woodside Correctional was questioned in regards to her medical and mental health history and he reported that her only mental health history was PTSD, however her list of allergies included antipsychotics which would indicate a more extensive mental health history.
>
> I am writing because I am concerned about multiple issues.
> 1) The staff were aware of self-injurious behaviors as early as that morning, why was she not in a more protected cell where she could not hurt herself.
> 2) Why was she able to lie in her own excrement and water long enough to be progressing towards hypothermia?
> 3) It is important that staff know and are able to provide adequate medical and mental health history.
> 4) Staff were aware that she had a history of manipulative behavior yet she was naked and alone with all male staffers while there were other female staffers available.
> 5) Staff need to be made aware that emergency calls need to be directed to 911.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Obviously we were not present all day and do not know all of the details leading up to the call, however I wanted to bring these issues to your attention.

Please feel free to contact me with any other questions.

389.     Defendant Simons responded to this report as follows:

Thank you for taking the time to look out for one of our kids. I have copied the Residential Licensing and Special Investigations Unit investigator in charge of regulating Woodside with your concerns. As it turns out we have an opportunity for you to come to Woodside to make a difference if you like. You can apply to a Woodside Worker B position online.

390.     An investigator from RLSIU contacted the member of the Essex Recue squad who reported what she witnessed on June 9, 2019. At this time, it is unclear what happened with that investigation.

391.     The Woodside Incident Reports related to the June 9, 2019 incident filed by Defendants Hatin, Piette, and Rochon do not explain why G.W. "was laying flat on the bed, naked except for a smock. The cell was covered with water, urine and menstrual fluid. She was soaking wet from head to toe, as was her smock. She was shivering uncontrollably and her extremities were extremely cold to the touch" when the EMT's from Essex Recue arrived at the scene.

392.     Defendant Cathcart approved the Operations Supervisor's report of the incident which claimed that the staff's "[q]uick response and staff knowing how to utilize their skills ensured we kept the resident safe when the resident was attempting to be unsafe and self harm."

393.     By June 2019, nearly six months after RLSIU had concluded that the conditions of confinement at Woodside violated numerous state regulations, and nearly three years after an attorney from the Office of the Juvenile Defender had described the inhumane conditions of confinement in the North Unit, DCF officials, including Defendants Schatz, Shea, Gooley, and Dale, and Woodside managers and clinicians, including Defendants Simons, Steward, Cathcart, Hatin, Bunnell, and Dubuc were aware that vulnerable children detained at Woodside, including G.W., were subjected to unspeakable abuse at the facility.

394.     Yet none of these defendants made any serious effort to prevent the continuing abuse of children whose safety and welfare was their responsibility, thus violating their constitutional obligation to protect Woodside detainees from the abuse and horror graphically depicted in the G.W. videos from June 2019.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

395.     At this point, it is impossible to catalogue every instance of the abuse G.W. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of G.W.'s DCF file and the video recordings of Woodside staff interactions with her.

## FACTUAL BACKGROUND
## T.F.

396.     Plaintiff T.F. entered DCF custody when she was eight years old; by 2017, she had endured thirty-seven placement transitions.

397.     Between the ages of three and seven, T.F. had been sexually abused by her father, had been subjected to physical abuse, and had witnessed physical abuse of other family members.

398.     Between 2015 and 2018, T.F. was detained at Woodside on a number of separate occasions during which she was subjected to unnecessary and painful physical restraints and solitary confinement in one of the North Unit's isolation cells.

399.     During one of her stays at Woodside, T.F. was apparently held in solitary confinement in a North Unit isolation cell for three to four months.

400.     It is not known at this time who gave the orders to send T.F. into the North Unit or who authorized her continued placement in the North Unit after the first seven days were up.

401.     However, by this time, Defendants Schatz, Shea, and Gooley were aware that children detained at Woodside were being transferred to solitary confinement in the North Unit and made no effort to stop the practice, thus violating their constitutional duty to protect those children from harm.

402.     On June 27, 2018, T.F. was physically restrained by Defendants Bunnell and Piette, and dragged across the floor by her feet to her cell with Bunnell still on top of her.

403.     As a result of this assault, T.F. suffered friction burns on her body.

404.     A video recording of this incident indicates that Defendant Bunnell appeared angry, agitated, and aggressive.

405.     On July 5, 2018, T.F.'s attorney from the Office of the Juvenile Defender filed a Motion for an Emergency Protective Order.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

406.     Subsequently, DCF's RLSIU investigated the allegations set forth in the Motion for an Emergency Protective Order.

407.     The RLSIU report indicates the video of this incident shows that before he restrained T.F., Defendant Bunnell was "angry, agitated, and aggressive."

408.     As staff members struggled with T.F., Defendant Bunnell "is seen with his knee on [T.F.'s] back. This is in direct contradiction to Woodside's restraint training in which staff members are instructed to never place their weight on a child's back as they are restrained in the prone position due to risk of asphyxia."

409.     Defendant Piette then "drags [T.F.] by her feet, across the carpeted floor and into her room, It appears Mr. Bunnell is still attempting to restrain her, and his weight is on her as she is being dragged. [T.F.] suffered friction burns from being dragged."

410.     T.F. suffered significant rug burns on her body as a result of being dragged across the floor by Defendant Piette.

411.     After T.F. was dragged across the floor, she was taken into a room where Defendant Bunnell punched her in the face with a closed fist.

412.     T.F. later informed Defendant Steward that Defendant Bunnell had punched her in the face.

413.     Even though she was a mandatory reporter, Defendant Steward did not inform the proper authorities that T.F. had told that T.F. had been assaulted by Defendant Bunnell.

414.     Following this incident, T.F. was locked away in the North Unit, where she made to sit in wet clothes on a slab with no blankets and no bedding.

415.     T.F. spent the rest of July 2018 locked away in the North Unit.

416.     After T.F.'s attorney had filed her Motion for a Protective Order, Defendants Steward and Bunnell pressured T.F. to dismiss her lawsuit.

417.     Over the objections of T.F.'s attorney, Defendant Steward facilitated a meeting between T.F. and Bunnell, during which Bunnell tried to persuade T.F. that he did not intend to punch T.F. and that it was an accident.

418.     Following this meeting, and over T.F.'s objections, Defendant Bunnell's attempts to persuade T.F. that he punched her accidently continued.

419.     At some point, Defendant Bunnell entered T.F.'s North Unit cell and told her that he would not deliberately hit her because T.F. was like a daughter to him.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

420.    After Defendant Steward testified at a court hearing held on Motion for a Protective Order, Defendant Steward told T.F. that if she continued to pursue her court case, T.F. would lose her relationship with Steward.

421.    Defendant Steward then advised T.F. that her attorney was trying to turn T.F. against Woodside which "had been there for [T.F.] through [her] hardest times" and that T.F.'s attorney was trying to "split up" T.F.'s relationship with Steward.

422.    Defendants Steward and Simons then advised T.F. to write a letter, instead of placing a call, to her attorney to inform the attorney that T.F. wanted her court case dismissed.

423.    Defendants Steward and Simons told T.F. that if she called her attorney, her attorney might "say something to wrap [her] back in."

424.    As a result of Defendants Steward's, Bunnell's, and Simons' pressure campaign, T.F. sent the letter to her attorney, who subsequently filed a motion to dismiss T.F.'s court case.

425.    On September 25, 2018, one of DCF's attorneys, Assistant Attorney General Kate Lucier, interviewed T.F.. T.F.'s attorney was present during the interview.

426.    During the interview, T.F. told AAG Lucier about Defendant Bunnell's assaultive conduct on June 27, 2018 and Defendants Steward's, Bunnell's, and Simons' campaign to pressure T.F. to dismiss the court case initiated on July 6, 2018 when her attorney filed the Motion for a Protective Order.

427.    Following the investigation, RLSIU concluded that the conduct of Woodside staff on June 27, 2018 toward T.F. was in violation of Regulation 201 (children in a residential treatment program have a right to "be free from harm by caregivers or others, and from unnecessary or excessive use of restraint and seclusion/isolation); Regulation 648 (Residential Treatment Programs are prohibited from employing "[r]estraints that impede a child/youth's ability to breathe or communicate," or using "[p]ain inducement to obtain compliance," and "[h]yperextension of joints;" and Regulation 651 ("Restraint shall be used only to ensure immediate safety of the child/youth or others when no less restrictive intervention has been, or is likely to be, effective in averting danger. Restraint shall only be used as a last resort").

428.    At this point, it is impossible to catalogue every instance of the abuse T.F. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of T.F.'s DCF file and the video recordings of Woodside staff interactions with her.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

# FACTUAL BACKGROUND
## B.C.

429.     Plaintiff B.C. has an extensive history of trauma and neglect. B.C.'s mother abandoned her as a toddler and she was raised by one of her father's relatives and his wife.

430.     As a child, B.C. was sexually abused.

431.     B.C. entered DCF custody as an unmanageable youth after she tried to run away while she was being transported to an alternative school in Bennington, Vermont.

432.     After a court adjudicated her guilt in two minor delinquent offenses (disorderly conduct and retail theft), B.C. was sent to Woodside.

433.     While imprisoned at Woodside, B.C. was repeatedly subjected to improper physical restraints and solitary confinement.

434.     On August 14, 2017, an attorney with the Office of the Juvenile Defender filed a grievance with Defendant Simons on behalf of Plaintiff B.C.

435.     The grievance complained that B.C. suffered a sprained ankle while being restrained by two male Woodside staff members on July 29, 2017.

436.     On August 17, 2017, an attorney with the Office of the Juvenile Defender filed a second grievance with Defendant Gooley on behalf of Plaintiff B.C.

437.     The grievance indicated that because Defendant Simons improperly restrained on August 13, 2017, the attorney asked Defendant Gooley to review both the original grievance related to the July 29, 2017 restraint and the second restraint involving Defendant Simons.

438.     On August 6, 2018, B.C. was restrained when unidentified staff members took her blankets away.

439.     Several weeks later, on August 25, 2018, Defendant Hatin and two other male Woodside staff members entered B.C.'s North Unit isolation cell and, with the assistance of Defendant Ruggles, pinned her to the floor and forcibly removed her clothing, leaving her buttocks and vulva exposed.

440.     Defendants Simons and Steward ordered Defendant Hatin to enter B.C.'s isolation cell and remove her clothing.

441.     This incident was captured on a video/audio recording.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

47

442.     The video provides a harrowing account of B.C.'s treatment at the hands of Defendants Hatin and Ruggles as B.C.'s primal screams can be heard throughout the recording.

443.     Before cutting her clothes off, Defendant Ruggles told B.C. that if she surrendered her clothes, she would be provided a safety smock.

444.     Throughout the incident, B.C. cried out "Don't touch me."

445.     As the restraint ended, B.C. was silent in the fetal position.

446.     Afterwards, B.C. was not provided with bedding or adequate clothing for her lower body for 48 hours.

447.     Defendant D'Amico witnessed B.C. pants-less on day two after the forcible removal of her clothing on 8/25/18. D'Amico made it known to many people, including Defendants Simons and Shea, how horrible and inhumane she thought that was.

448.     After reviewing a video of the incident, Paul Capcara, R.N., reported the abuse of B.C. with DCF's RLSIU.

449.     Mr. Capcara was particularly "concerned that [B.C.] was left naked from the waist down as a result of the restraint. There were further concerns that given the youth's sexual abuse history, the restraint was authorized to be done by a group of male staff members" and that the restraint "occurred without any visible imminent risk of harm to self or others."

450.     After completing their investigation, RLSIU investigators criticized Defendant Ruggles attempt to use the provision of a safety smock as a bargaining chip: "The language [recorded on the video] describes a power struggle between [B.C.] and the staff members at Woodside, which is advised against in her safety plan and not aligned with DBT practice. The safety smock should be seen as a basic need for [B.C.'s] safety and privacy, not a bargaining chip for compliance."

451.     RLSIU investigators then concluded that Woodside was found in violation of Regulation 201 (a resident has the right to be free from excessive use of restraint and seclusion); Regulation 601 (a residential treatment program shall provide adequate supervision to the treatment and developmental needs of children/youth); Regulation 648 (a residential treatment facility shall prohibit all cruel, severe, unusual or unnecessary practices); Regulation 650 (restraints may not be employed without prior approval of the Licensing Authority); Regulation 651 (limitations on the use of restraints); Regulation 660 (residents in seclusion cells shall be subject to uninterrupted monitoring); and Regulation 718 ("No child/youth's room shall be stripped of its contents and used for seclusion").

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

452.    By late August 2018, B.C. had been confined to a seclusion cell in the North Unit for about a month.

453.    It is not known at this time who ordered B.C.'s transfer to solitary confinement in the North Unit or who reviewed and approved further confinement after B.C. had spent her first seven days in the North Unit.

454.    However, by this time, Defendants Schatz, Shea, and Gooley were aware that children detained at Woodside were being transferred to solitary confinement in the North Unit and made no effort to stop the practice, thus violating their constitutional duty to protect those children from harm.

455.    While B.C. was confined to her cell in the North Unit, she was forced to shower naked in front of staff, could not wear any clothing, and could not have books, paper, or writing implements.

456.    In August 2018, B.C. continued to have no access to group programming, education, or recreation at Woodside.

457.    On August 23, 2018, B.C.'s attorney filed a motion in the Vermont Family Court requesting reconsideration of a court order denying a request for a protective order that would have required DCF to secure an appropriate alternative placement for B.C. by a date certain.

458.    The motion alleged that "Woodside has restrained [B.C.] by pinning her face-down against the floor or a wall, pulling her arms behind her back, and twisting her arms."

459.    It is not known at this time which Woodside staff members engaged in this conduct.

460.    Counsel attached an affidavit prepared by Heather Lynch, a licensed psychologist who was familiar with the conditions of B.C.'s confinement at Woodside.

461.    In her affidavit, Lynch reported that "[B.C.'s] current placement is not meeting her needs for treatment and comfort … [and that] [m]aintaining [B.C.] in deprived conditions and not providing her with appropriate treatment accommodations is detrimental to [B.C.'s] ability to heal."

462.    At this point, it is impossible to catalogue every instance of the abuse B.C. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of B.C.'s DCF file and the video recordings of Woodside staff interactions with her.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

## FACTUAL BACKGROUND
### A.L.

463.     In 2018, A.L. was in DCF custody and detained at Woodside.

464.     A.L., who turned 13 on November 23, 2017, was the youngest Woodside detainee.

465.     In 2018, A.L was repeatedly subjected to painful restraints by Woodside staff members.

466.     On August 13, 2018, for example, A.L. suffered rug burns from being dragged on the floor during one of these restraints.

467.     Defendant Steward approved Defendant Hamlin's request to restrain A.L.

468.     The reports related to this incident do not explain how A.L. suffered the "rug burn" on his right shoulder or why he complained about a sore right elbow.

469.     In addition, A.L. spent extended periods of time in solitary confinement, locked away in one of the North Unit seclusion cells.

470.     Defendant Steward approved staff requests to send A.L. into solitary confinement in Woodside's North Unit.

471.     In April 2018, Defendant Dubuc ordered A.L. into the North Unit, later claiming that A.L. "voluntarily" agreed to Dubuc's unilateral decision to place A.L. into solitary confinement.

472.     On May 2, 2018, an attorney with the Office of the Juvenile Defender submitted a grievance on behalf of A.L. to Defendant Simons objecting to A.L.'s transfer to a seclusion cell in the North Unit.

473.     In response to grievances filed on behalf of A.L., Defendant Simons justified Woodside's use of physical restraints and solitary confinement as a legitimate method to control A.L. behavior.

474.     The physical abuse of A.L. continued after DCF sent its detainees to the Middlesex Adolescent Program (MAP) in 2020.

475.     On April 15, 2020, a video recording captured Defendant Brice shoving A.L. "with significant force using two hands on [A.L.'s] neck. [A.L.] appears to be pushed into the wall from the force of the shove to the neck."

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
R O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

476.     The previous day, Brice notified Defendant Simons that he "was feeling anxiety and having difficulty sleeping because of the working conditions at MAP.".

477.     Simons denied Brice's request to be relieved of duty and was required to complete his shift.

478.     The incident was subsequently investigated by DCF's Residential Treatment Program Regulatory Intervention Unit (RTPRI) whose investigators concluded that MAP violated Regulation 122 (written report of any incident that potentially affects safety, physical or emotional welfare of child/youth within 24 hours); Regulation 201 (prohibition on the use of excessive force); Regulation 401 (program shall not hire or continue to employ persons whose behavior may endanger children/youth); Regulation 403 (facility must maintain sufficient number of staff); Regulation 416 (staff shall receive training in the prevention and use of restraint); Regulation 423 (program shall establish procedures for adequate communication and support among staff to provide services to children/youth); Regulation 648 (program shall prohibit the use of cruel, severe or unnecessary practices); Regulation 650 (program shall not use any form of restraint without prior approval); and Regulation 651 (restraint may only be used to ensure the immediate safety of the child/youth).

479.     RTPRI investigators interviewed Todd Fountain of JKM Training.

480.     In December 2019, DCF notified the federal court that it had implemented a new policy requiring Woodside staff to employ de-escalation techniques included in the nationally-recognized Safe Crisis Management system.

481.     JKM Training was hired by DCF to train Woodside staff in the techniques included in the Safe Crisis Management System.

482.     Fountain told RTPRI investigators that Woodside staff members were told by Defendant Simons "to go back to the old techniques if [the Safe Crisis Management techniques were not] working."

483.     Fountain suggested that Defendant Simons might be "sabotaging its implementation" in an effort to prove that "what they were doing [before the federal court intervened] was good."

484.     According to Fountain, the conduct of Woodside/MAP staff exhibited the belief that "intimidation is a behavior-management strategy."

485.     On June 29, 2020, A.L. was again assaulted by Woodside/MAP staff, led by Defendant Hamlin.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

486.     During the assault, A.L. was knocked to the floor, A.L.'s arms were twisted and pulled behind his back, and A.L.'s legs were crossed while his feet were moved up against his buttocks.

487.     In its August 2019 order, the federal court specifically banned the further use of this painful and unnecessary restraint technique ("The focus of forcing youths into the final position – arms raised behind the back, feet crossed and pushed into the buttocks – results in prolonged struggles on the floor").

488.     On July 7, 2020, Disability Rights Vermont reported the two assaults to the federal court.

489.     According to Disability Rights Vermont, a "review of the video of the June 29, 2020 incident regarding two youths confirms that the same, or even more dangerous, pain-inflicting maneuvers that existed prior to this litigation were used again, despite this Court's Preliminary Injunction Order and Order approving the Settlement Agreement."

490.     In August 2020, newly-appointed DCF Commissioner Sean Brown told Vermont State legislators that when Woodside staff members assaults A.L., they "ultimately reverted to some techniques that aren't supported by the new model that we're using in the facility."

491.     According to Commissioner Brown, Woodside staff restrained A.L. "in a way that's inappropriate in a prone position."

492.     At this point, it is impossible to catalogue every instance of the abuse A.L. at Woodside and identify which of the defendants named in this Amended Complaint participated in that abuse because Plaintiff's counsel has yet to receive a copy of A.L.'s DCF file and the video recordings of Woodside staff interactions with him.

## CAUSES OF ACTION

### COUNT ONE

### Violations of the Eighth Amendment's ban on cruel and unusual punishment

493.     Plaintiffs repeat and incorporate herein paragraphs 1 through 573.

494.     At all times material hereto, Defendants Schatz, Shea, Gooley, Wolcott, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, D'Amico, Hamlin, and Brice were acting under color of state law.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

52

495.     The Eight Amendment guarantees Plaintiffs' right to be free from cruel and unusual punishment.

496.     Defendants were vested with control over the custody and care of Plaintiffs.

497.     In addition, Defendants Schatz, Shea, Gooley, Wolcott, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, D'Amico, Hamlin, and Brice owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

498.     Between 2017 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants Schatz, Shea, Gooley, Wolcott, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice either unlawfully isolated Plaintiffs in seclusion cells in Woodside's North Unit, physically restrained them in violation of Plaintiffs' constitutional rights and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution in violation of 42 U.S.C. §1983, or failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe, and to detect and correct problems that could cause injury to Plaintiffs.

**COUNT TWO**

**Violations of the Eighth Amendment's and
Fourteenth Amendment's ban on the use of excessive force**

499.     Plaintiffs repeat and incorporate herein paragraphs 1 through 579.

500.     At all times material hereto, Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice were acting under color of state law.

501.     The Eighth Amendment and Fourteenth Amendment guarantees Plaintiffs' right to bodily integrity and to be secure in their person and free from excessive force.

502.     The actions and use of force, or their failure to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs. as described herein, of Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin,

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

and Brice were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.

503.     The use of force by Defendants shocks the conscience.

504.     Defendants Simons, Steward, Bunnell, Cathcart, Dubuc, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Hamlin, and Brice used such force as was objectively unreasonable, excessive, and conscience-shocking physical force.

505.     Defendants Schatz, Shea, Gooley, Wolcott, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice failed to take reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking excessive force of other Defendants despite being in a position to do so.

506.     The individual Defendants acted in concert and joint action with each other.

507.     The aforementioned acts of Defendants were perpetrated against Plaintiffs without legal justification. The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

508.     Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants Schatz, Shea, Gooley, Wolcott, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice either unlawfully isolated Plaintiffs in seclusion cells in Woodside North Unit, to physically restrain them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to be free from excessive force as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983 or failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

## COUNT THREE

### Deprivation of Plaintiffs' rights to due process of law as guaranteed by the Fourteenth Amendment

509.     Plaintiffs repeat and incorporate herein paragraphs 1 through 589.

510.     At all times material hereto, Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice were acting under color of state law.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

511.     The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

512.     Defendants Schatz, Shea, Gooley, Wolcott, D'Amico,  Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice were vested with control over the custody and care of Plaintiffs.

513.     Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

514.     Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice violated Plaintiffs' Fourteenth Amendment rights when they confined, restrained, treated, and punished Plaintiffs in the aforementioned manner or failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

515.     Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice deprived Plaintiffs of their protected liberty interest by punishing, restraining, and confining Plaintiffs in the manner aforementioned or failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

516.     The aforementioned acts of Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice were perpetrated against Plaintiffs without legal justification.  The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

517.     Between 2016 and 2020, while Plaintiffs were detained at Woodside and the Middlesex Adolescent Program, Defendants Schatz, Shea, Gooley, Wolcott, D'Amico, Simons, Steward, Bunnell, Cathcart, Dubuc, Scrubb, Hatin, Weiner, Martinez, Ruggles, Piette, Rochon, Dale, Hamlin, and Brice either unlawfully isolated Plaintiffs in seclusion cells in Woodside North Unit, physically restrained them in violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983 or failed to fulfill their constitutional

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

## COUNT FOUR

**Defendants Schatz, Dale, D'Amico, Longchamp, Harriman and Wolcott violated R.H.'s and D.H.'s Eighth Amendment right against cruel and unusual punishment and their Fourteenth Amendment right to due process of law and were deliberately indifferent to the abuse perpetrated against R.H. and D.H. by staff members at the Natchez Trace Youth Academy**

518.     Plaintiffs repeat and incorporate herein paragraphs 1 through 598.

519.     At all times material hereto, Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott were acting under color of state law.

520.     The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

521.     Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott were vested with control over the custody and care of Plaintiffs.

522.     Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs.

523.     Defendants Schatz, Dale, D'Amico, Longchamp, Harriman, and Wolcott ignored complaints about the inhumane conditions at the Natchez Trace Youth Academy registered by Plaintiffs R.H. and D.H., demonstrating deliberate indifference to the repeated violations of R.H.'s and D.H's civil and constitutional rights which directly and negatively impacted their physical safety and emotional well-being in violation of their (a) right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution; (b) right to be free from excessive force as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution; and (c) right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

## COUNT FIVE

**Defendants Simons, Steward, and Bunnell violated R.H.'s and T.F.'s First Amendment's Right to Petition the Government for a Redress of Grievances**

524.     Plaintiffs repeat and incorporate herein paragraphs 1 through 604.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

525.    At all times material hereto, Defendants Simon, Steward, and Bunnell were acting under color of state law.

526.    The First Amendment guarantees Plaintiff R.H.'s and T.F.'s right to petition the government for a redress of grievances.

527.    Defendants Simons, Steward, and Bunnell were vested with control over the custody and care of Plaintiffs R.H. and T.F..

528.    From July 2018 through September 2018, Defendant Steward unlawfully interfered with R.H.'s right to counsel by blocking his access to his attorney and threatening to retaliate against him if he continued to pursue the case his attorney filed in the Vermont Superior Court on July 6, 2018.

529.    At the same time, Defendant Steward unlawfully promised R.H. that he would receive certain additional privileges if he dropped his lawsuit.

530.    In August and September 2018, Defendants Simons and Steward unlawfully pressured R.H. to contact his attorney and tell her to dismiss the case his attorney filed in the Vermont Superior Court on July 6, 2018.

531.    On September 11, 2018, R.H. finally succumbed to Defendants Simons' and Steward's unlawful pressure campaign and informed his attorneys he wanted his case dismissed.

532.    In response to R.H.'s September 11, 2018 letter, his attorneys dismissed the Complaint.

533.    On July 5, 2018, T.F.'s attorney filed a Motion for a Protective Order in the Vermont Superior Court, Caledonia Family Division, in which T.F. alleged that Defendant Bunnell had assaulted her on June 27, 2018 by punching her in the face.

534.    T.F. told Defendant Steward about the assault, but Steward did not report Bunnell's assault to the appropriate authorities even though she was mandated to do so.

535.    After T.F. filed the Motion for a Protective Order, Defendants Steward and Bunnell unlawfully pressured T.F. as described above to dismiss her lawsuit.

536.    While she was still detained at Woodside, T.F. ultimately succumbed to Defendants Steward's and Bunnell's unlawful pressure campaign, and instructed her attorney to dismiss the case in a letter Defendant Steward advised her to write.

537.    Defendants Simons, Steward, and Bunnell retaliated against R.H. and T.F. after they registered complaints about the abuse their suffered at Woodside in

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

violation of Plaintiffs' constitutional rights, and engaged in wanton and willful conduct that violated Plaintiffs' First Amendment rights in violation of 42 U.S.C. §1983.

## COUNT SIX

### Supervisory liability for the failing to supervise subordinates who violated Plaintiffs' constitutional rights

538.     Plaintiffs repeat and incorporate herein paragraphs 1 through 618.

539.     Defendants Schatz, Shea, Gooley, Wolcott, and Simons, after receiving repeated reports, complaints, grievances, and investigatory reports prepared by RLSIU about the abuse of Woodside detainees, demonstrated deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment, excessive force, and solitary confinement failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs in violation of Plaintiffs' Eighth Amendment rights against excessive force and cruel and unusual punishment and their right to substantive and procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

## DAMAGES – COUNTS ONE THROUGH SIX

540.     Plaintiffs repeat and incorporate herein paragraphs 1 through 620.

541.     As a result of Defendants outrageous, illegal, unconstitutional, assaultive, and unlawful conduct as detailed above, Plaintiffs suffered serious physical and psychological injuries, both temporary and permanent, and are entitled to compensatory damages resulting from those injuries.

542.     Based on Defendants' willful and wanton disregard for, and deliberate indifference to, Plaintiff's constitutional rights, Plaintiffs are entitled to exemplary damages.

543.     In addition, Defendants are liable to Plaintiffs for those damages pursuant to 42 U.S.C. §1983 and for their attorney's fees and litigation expenses pursuant to 42 U.S.C. §1988.

## PENDENT STATE CLAIMS

### COUNT SEVEN
### Assault and Battery

544.     Plaintiffs repeat and incorporate herein paragraphs 1 through 624.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

545.     While Plaintiffs were detained at Woodside and the Middlesex Adolescent Program between 2016 and 2020, Defendants Simons, Steward, Bunnell, Cathcart, Martinez, Weiner, Piette, Rochon, Hamlin, Ruggles, Hatin, and Bryce repeatedly placed them in isolation cells in the North Unit and physically assaulted them.

## Damages for Assault and Battery

546.     As a result of Defendants' outrageous, illegal, unconstitutional, and unlawful conduct, Plaintiffs suffered serious physical and psychological injuries, both temporary and permanent and are entitled to compensatory damages resulting from those injuries.

547.     Based on Defendants' intentional misconduct, Plaintiffs are also entitled to exemplary damages.

## COUNT EIGHT

### Intentional Infliction of Emotional Harm

548.     Plaintiffs repeat and incorporate herein paragraphs 1 through 628.

549.     Defendants were vested with control over the custody and care of Plaintiffs.

550.     The conduct of Defendants Simons, Steward, Dubuc, Hatin, Cathcart's, Bunnell, Weiner, Hamlin, Martinez, Piette, Ruggles, and Brice, whereby they unlawfully confined, restrained, mistreated, and punished Plaintiffs and failed to fulfill their constitutional duty to ensure that Plaintiffs were reasonably safe and to detect and correct problems that could cause injury to Plaintiffs was so outrageous and extreme as to go beyond all possible bounds of decency.

551.     These Defendants intended to cause emotional distress to Plaintiffs and/or acted in reckless disregard of the probability of causing emotional distress to Plaintiffs.

552.     Plaintiffs have suffered and continue to suffer emotional distress.

553.     The aforementioned acts of Defendants Simons, Steward, Dubuc, Hatin, Cathcart's, Bunnell, Weiner, Hamlin, Martinez, Piette, Ruggles, and Brice were perpetrated against Plaintiffs without legal justification.  The acts were excessive, done with actual malice towards Plaintiffs, and with willful and wanton indifference to, and deliberate disregard for human life and the constitutional rights of Plaintiffs.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

554.     By repeatedly placing Plaintiffs in isolation cells in Woodside North Unit and by physically assaulting them, the outrageous and inexcusable conduct of Defendants Simons, Steward, Dubuc, Hatin, Cathcart's, Bunnell, Weiner, Hamlin, Martinez, Piette, Ruggles, and Brice caused Plaintiffs to suffer from extreme emotional distress.

## DAMAGES

### Intentional Infliction of Emotional Harm

555.     As a result of Defendants' intentional infliction of emotion harm, Plaintiffs are entitled to both compensatory and exemplary damages.

## COUNT NINE

### Defendants' grossly negligent and reckless supervision of persons in their custody and control

556.     Plaintiffs repeat and incorporate herein paragraphs 1 through 636.

557.     By statute, Defendants Schatz, Shea, Gooley, Wolcott, Simons were vested with control, custody, and supervision of Plaintiffs and had a duty to protect Plaintiffs from foreseeable harm.

558.     Defendants Schatz, Shea, Gooley, Wolcott, and Simons owed Plaintiffs a duty of care to ensure their custody was reasonably safe and to detect and correct problems that could cause injury to Plaintiffs

559.     As a result of their grossly negligent and reckless conduct, Defendants breached their duty of care to Plaintiffs.

## DAMAGES

### Grossly negligent and reckless supervision

560.     As a result of Defendants' breach of their duty of care to Plaintiffs, Plaintiffs suffered physical and emotional harm, both temporary and permanent, for which they are entitled damages and other compensation in an amount to be determined by the jury.

WHEREFORE, Plaintiffs request that this Court:

1.     enter judgment in their favor on all counts of the Complaint;

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

2.    award Plaintiffs compensatory damages in an amount to be determined by the Court;

3.    award medical expenses related to the treatment of Plaintiffs' injuries, which are claimed as special damages, Fed.R.Civ.Pro. 9(g);

4.    award exemplary damages for Defendants' outrageous and illegal conduct;

5.    award Plaintiffs attorney's fees and expenses pursuant to 42 U.S.C. § 1988;

6.    grant such other and further relief as this Court deems proper.

Plaintiffs hereby demand a trial by jury.

DATED at Burlington, Vermont this 28 day of June, 2022.

Respectfully submitted,

_____
Brooks G. McArthur, Esq.
Jarvis, McArthur & Williams

_____
David J. Williams, Esq.
Jarvis, McArthur & Williams

Counsel for Plaintiffs

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

61